# In the United States Court of Federal Claims

No. 18-49
Filed: April 9, 2018
PUBLIC VERSION[*]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| \* | |
| \* | 5 U.S.C. § 706 (Administrative Procedure |
| \* | Act, Scope of Judicial Review); |
| \* | 28 U.S.C. § 1491(b)(1) (United States |
| GENERAL DYNAMICS MISSION  \* | Court of Federal Claims Bid |
| SYSTEMS, INC.,  \* | Protest Jurisdiction); |
| \* | 41 U.S.C. §§ 3551–56 (Competition In |
| Plaintiff,  \* | Contracting Act Of 1984); |
| \* | 48 C.F.R. §§ 1.102-2 (Performance |
| v.  \* | Standards); 8.405-2 (Order |
| \* | Procedures For Services Requiring |
| THE UNITED STATES,  \* | A Statement Of Work); 8.405-3 |
| \* | (Blanket Purchase Agreements); |
| Defendant,  \* | 14.101 (Elements Of Sealed |
| \* | Bidding); 15.101-1 (Tradeoff |
| and  \* | Process); 15.308 (Source Selection |
| \* | Decision); and |
| UNISYS CORPORATION,  \* | Rules of the United States Court of |
| \* | Federal Claims 24(a)(2) |
| Defendant-Intervenor.  \* | (Intervention Of Right); 52.1 |
| \* | (Motion for Judgment on the |
| \* | Administrative Record). |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Paul F. Khoury**, Wiley Rein LLP, Washington, D.C., Counsel for Plaintiff.

**Jeffrey A. Regner**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

**Richard J. Webber**, Arent Fox LLP, Washington, D.C., Counsel for Defendant-Intervenor.

### MEMORANDUM OPINION AND FINAL ORDER

---

[*] On March 29, 2018, the court forwarded a sealed copy of this Memorandum Opinion And Final Order to the parties to redact any confidential and/or privileged information from the public version and note any citation or editorial errors that required correction. The redactions that appear in this Memorandum Opinion And Final Order were suggested by all parties and approved by the court.

**BRADEN**, *Chief Judge.*

The Transportation Security Administration (the "TSA") has approximately 15,000 units of equipment across the country that do not have "network connectivity" and are adversely affecting the agency's performance in a number of areas, including "deploying intelligence to the front lines." Private companies were asked to provide proposals to address this problem. The TSA represented that proposals would be evaluated so that "the non-price factors, [including technical factors], when combined, [would be] significantly more important than price[.]"

The TSA received proposals from five prominent information technology firms, but selected one that received only an "Acceptable" technical rating, with three "unresolved weaknesses," one of which entailed "[continuing] . . . concerns over the potential restructuring of TSA's IT network." In addition, the TSA's technical evaluators expressed concerns about a "post implementation operational model that would be required for the ███████████████ needed to implement [that firm's] proposed connectivity solution." But, the TSA concluded that these concerns presented only a "Moderate" risk to the TSA. In addition, the TSA decided that the $150.9 million price difference between the two leading proposals was more important than the technical differences, despite the fact that the "original [technical] flaw . . . remains█████ ████████████████████████████████████████████████ and ███ the impact of a failure would be devastating, throwing hundreds of TSE offline and delaying the screening operations for the checkpoints[.]"

The United States Court of Appeals for the Federal Circuit has held that "technical ratings . . . involve discretionary determinations of procurement officials that the court *will not second guess.*" *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996) (emphasis added).[1] Adherence to this precedent, however, requires the court to exempt technical evaluations from traditional Administrative Procedure Act review. Therefore, if the United States Court of Appeals for the Federal Circuit has an occasion to reconsider that directive, either on appeal of this or another case, it is suggested that the Court clarify that technical ratings, particularly in cases where a mistake in agency judgment could jeopardize the safety of the public, are not entitled to absolute deference, even where the agency conducts a "best value" tradeoff in awarding a contract.

---

[1] This holding has been cited in the following precedential cases: *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901 (Fed. Cir. 2013); *COMINT Sys. Corp. v. United States*, 700 F.3d 1377 (Fed. Cir. 2012); *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320 (Fed. Cir. 2011); *Tyler Const. Grp. v. United States*, 570 F.3d 1329 (Fed. Cir. 2009); *Centech Grp. Inc. v. United States*, 554 F.3d 1029 (Fed. Cir. 2009); *CHE Consulting, Inc. v. United States*, 552 F.3d 1351 (Fed. Cir. 2008); *Renda Marine, Inc. v. United States*, 509 F.3d 1372 (Fed. Cir. 2007); *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324 (Fed. Cir. 2004); *Banknote Corp. of America, Inc. v. United States*, 365 F.3d 1345 (Fed. Cir. 2004); *R & W Flammann GmbH*, 339 F.3d 1320 (Fed. Cir. 2003); and *IMCO, Inc. v. United States*, 97 F.3d 1422 (Fed. Cir. 1996).

For the convenience of the parties, the court has prepared a Table Of Abbreviations, attached hereto as Exhibit A.  To facilitate review of this Memorandum Opinion And Final Order, the court has provided the following outline.

I.    RELEVANT FACTUAL BACKGROUND.
      A.    Transportation Security Administration Pre-Solicitation Environment And
            Activity.
      B.    The Quotation Evaluation Plan.
      C.    The Transportation Security Administration's Request For Quotations For
            DOMAIN Support Services.
            1.    Corporate Experience.
            2.    Technical Approach.
            3.    Staffing Approach.
            4.    Past Performance.
            5.    Price.
      D.    Initial Proposals In Response To The Request For Quotations.
      E.    The Price Evaluation Team's Initial Price Evaluation.
      F.    The Technical Evaluation Team's Initial Technical Evaluation.
      G.    The Quote Selection Committee's Down-Select Recommendation.
      H.    The Transportation Security Administration's Communications With General
            Dynamics Mission Systems, Inc. And Unisys Corporation.
      I.    Revised Proposals In Response To Communications With The Transportation
            Security Administration.
      J.    The Technical Evaluation Team's Revised Technical Evaluation.
      K.    The Price Evaluation Team's Revised Price Evaluation.
      L.    The Quote Selection Committee's Trade-Off Recommendation.
      M.    The Quote Selection Authority's Quote Selection Decision.

II.   PROCEDURAL HISTORY.

III.  DISCUSSION.
      A.    Subject Matter Jurisdiction.
      B.    Standing.
            1.    General Dynamics Mission Systems, Inc.'s Complaint.
            2.    General Dynamics Mission Systems, Inc.'s Argument.
            3.    The Government's Response.
            4.    General Dynamics Mission Systems, Inc.'s Reply.
            5.    Relevant Precedent.
            6.    The Court's Resolution.
      C.    Whether The Transportation Security Administration's Award To Unisys
            Corporation Violated The Administrative Procedure Act, 5 U.S.C. § 706(2)(A).
            1.    Standard Of Review For Judgment On The Administrative Record,
                  Pursuant To RCFC 52.1.
            2.    Standard Of Review For A Bid Protest.

3.   General Dynamics Mission Systems, Inc.'s Complaint.

4.   General Dynamics Mission Systems, Inc.'s Motion For Judgment On The Administrative Record.

5.   The Government's Response And Cross-Motion For Judgment On The Administrative Record.

6.   Unisys Corporation's Response And Cross-Motion For Judgment On The Administrative Record.

7.   General Dynamics Mission Systems, Inc.'s Reply In Support Of The Motion For Judgment On The Administrative Record And Opposition To The Government's And Unisys Corporation's Cross-Motions For Judgment On The Administrative Record.

8.   The Government's Reply In Support Of The Cross-Motion For Judgment On The Administrative Record.

9.   Unisys Corporation's Reply In Support Of The Cross-Motion For Judgment On The Administrative Record.

10.  The Court's Resolution.

    a.   The Transportation Security Administration Did Not Violate FAR 8.405-3(b)(2).

        i.    The Technical Evaluation Team Fairly Considered Quotations Submitted In Response To The Request For Quotations.

        ii.   The Price Evaluation Team Fairly Considered Quotations Submitted In Response To The Request For Quotations.

        iii.  The Quotation Selection Authority Complied With The Request For Quotations In Awarding The Blanket Purchase Agreement.

    b.   The Administrative Record Does Not Evidence That The Technical Evaluation Team's "Moderate" Risk Rating Of Unisys Corporation's Proposal Was Arbitrary And Capricious.

IV.   CONCLUSION.

I.      **RELEVANT FACTUAL BACKGROUND.**[2]

     A.      **Transportation Security Administration Pre-Solicitation Environment And Activity.**

The TSA uses approximately fifteen thousand units of Transportation Security Equipment ("TSE")[3] across the country.  Tab 7, AR 279.  "Much of this [TSE] was either inherited from the private airport security operators[,] who had existed before 9/11[,] or acquired afterwards without standard Information Technology ("IT") requirements, including network connectivity."  Tab 7, AR 279.  The TSE's lack of network connectivity "led to a capability gap that impedes [the] TSA's performance" in:  (1) automating equipment data collecting and monitoring; (2) security configuration management; (3) remote monitoring and maintenance; and (4) deploying intelligence to the front lines.  Tab 7, AR 279–80.

The TSA has two Mission Essential Functions:  (1) "[p]rovide executive leadership and incident management status of [the TSA's] response to a crisis, attack, or other events affecting the security of the Nation's transportation systems;" and (2) "[c]ollect, analyze[,] and disseminate intelligence and threat-related information pertaining to the security of the [N]ation's transportation systems."  Tab 7, AR 280.  The TSA determined that the wholesale upgrade of the TSE to comply with the Mission Essential Functions was not practical and instead looked for "alternative approaches to providing this mission-essential capability in an effective, efficient, and secure manner."  Tab 7, AR 280.

The TSA decided to solicit Domain Awareness Integrated Network ("DOMAIN") support services from private contractors to develop, modernize, and enhance the Security Technology Integrated Program ("STIP").[4]  Tab 7, AR 275, 279.  To pursue this solution, the TSA issued a solicitation to establish a Blanket Purchase Agreement ("BPA"), the purpose of which was to restore "TSE back online, meet cyber security requirements,[5] save cost to [the] TSA, enable [the]

---

    [2]   The facts recited herein were derived from the Corrected Administrative Record (Tabs 1–61, AR 1–7891).

    [3]   TSE includes Walk-through Metal Detectors ("WTMD"), advanced imaging technology, whole body imagers, carry-on X-rays, explosive trace detectors, and explosive detection systems.  Tab 7, AR 279.

    [4]   The STIP "was established as a Department of Homeland Security . . . Level II IT Program to network the deployed TSE."  Tab 7, AR 280.

    [5]   Nine cyber security requirements were listed:  (1) Operating System ("OS") Currency/Security Patching; (2) Operating System Hardening; (3) Anti-Virus Updates; (4) Personal Identity Verification ("PIV") Compatibility; (5) Security Scanning Support; (6) Technical Obsolescence; (7) Security Operating Center Monitoring; (8) Plan of Action and Milestones Support; and (9) Vendor Information Systems Security Officer Designation.  Tab 7, AR 283–84.

TSA to meet both current and emerging cyber security requirements, and address the evolving threat environment through a consistent, scalable, and flexible system architecture and interface." Tab 7, AR 285.



**Figure 1: Notional STIP Architecture**
(Secure Gateway is a notional representation of a solution package that will meet at least the nine cybersecurity requirements for the TSE endpoints)

Tab 7, AR 283.

On April 12, 2017, the TSA posted Notice Number HSTS04-17-I-STAD01 on the Federal Business Opportunities website to describe the requested DOMAIN support services and allow interested parties to request Sensitive Security Information vetting in order to access Sensitive Security Information documents for the procurement. Tab 6, AR 179.

### B.    The Quotation Evaluation Plan.

On May 12, 2017, the TSA issued the Quotation Evaluation Plan to "establish[] the organization and the evaluation procedures for evaluating quotes received in response to Request For Quote HSTS04-17-Q-CT2506" (the "RFQ" or the "DOMAIN RFQ").[6] Tab 16, AR 1119.

The Quotation Evaluation Plan stated the responsibilities of: (1) the Price Evaluation Team ("PET"); (2) the Technical Evaluation Team ("TET"); (3) the Quotation Selection Committee ("QSC"); and (4) the Quotation Selection Authority ("QSA"). Tab 16, AR 1159. The PET's responsibility was to evaluate price and "prepare a price evaluation report and assist in preparing the tradeoff analysis and award recommendation." Tab 16, AR 1159. The TET's responsibility was to evaluate the technical aspects of the quoters' proposals and assign each aspect a rating. Tab 16, AR 1159. The TET was to "provide a written technical evaluation report that clearly

---

[6]    The Quotation Evaluation Plan was amended three times. Tab 16, AR 1117–68. On June 6, 2017, the TSA issued Amendment A0001 to change the factor descriptions for Factor 1, Corporate Experience and Factor 3, Staffing Approach. Tab 16, AR 1134–35. On June 19, 2017, the TSA issued Amendment A0002 to change the "Advisors" on the QSC. Tab 16, AR 1132–33. On August 11, 2017, the TSA issued Amendment A0003 to change the "Advisors" on the QSC. Tab 16, AR 1156–68. All subsequent citations herein are made to the most recent version of the Quotation Evaluation Plan.

documents the results of the evaluation, assist in preparing the tradeoff analysis[,] and provide a recommendation of the [q]uoter for award." Tab 16, AR 1159.  The QSC's responsibility was to "review the evaluation materials, including the tradeoff and award recommendation prepared by the TET and PET[.]  The QSC [would] then make [a] recommendation to the QSA." Tab 16, AR 1159.  The final decision and award would be made by the QSA.  Tab 16, AR 1159.

The Quotation Evaluation Plan contemplated that quotations submitted in response to the DOMAIN RFQ would be evaluated on the following factors: (1) corporate experience; (2) technical approach; (3) staffing approach; (4) past performance; and (5) price.  Tab 14, AR 982–85.  The Quotation Evaluation Plan provided the following ratings for the TET's technical evaluation for Factor 2, Technical Approach:

| FACTOR | RATINGS | | | |
|---|---|---|---|---|
| | Outstanding | Good | Acceptable | Unacceptable |
| Factor 2- Technical Approach | The [q]uoter's approach to Factor 2 greatly exceeds [the] TSA's requirements in several areas. The TET noted several Strengths.  There are no noted Weaknesses or Deficiencies. There is no risk to the [TSA]. | The [q]uoter's approach to Factor 2 exceeds [the] TSA's requirements in at least one area. The TET noted at least one Strength. Any noted Weaknesses are capable of correction and offset by the noted Strengths. There are no noted Deficiencies. Risk to the [TSA] is low. | The [q]uoter's approach to Factor 2 generally meets [the] TSA's requirements. There may be Strengths, but offset by Weaknesses or Deficiencies. Risk to the [TSA] is low/moderate. | The [q]uoter's approach to Factor 2 fails to meet one or more [the] TSA requirements. Any noted Strengths are offset by the noted Weaknesses and/or Deficiencies. Risk to the [TSA] is high. |

Tab 16, AR 1167.

The Quotation Plan provided that "[a]ny quote that is assigned a rating of 'Unacceptable' for any [f]actor will be eliminated from further consideration.  The [TSA] will not evaluate the rest of the [f]actors if any factor is found to be 'Unacceptable.'"  Tab 16, AR 1159.  In addition, "Strength" was defined as "[a]n element of the quote which increases the likelihood of successful contract performance, or provides an approach directly related to the requirement that exceeds a requirement of the solicitation in a beneficial way to the [TSA]."  Tab 16, AR 1166.  "Weakness" was defined as "[a] flaw in the quote that increases the likelihood of unsuccessful contract performance."  Tab 16, AR 1166.  "Deficiency" was defined as "[a] material failure of the quote to meet a requirement or a combination of 'Weaknesses,' that increase the likelihood of unsuccessful performance to an [U]nacceptable level."  Tab 16, AR 1166.  And, "Risk" was defined as

[a] measure of the inability to achieve program objectives within defined cost and schedule constraints.  Risk is associated with all aspects of the program, *e.g.*, threat, technology, design process, or Work Breakdown Structure . . . elements.  Risk, has

two components, the probability of failing to achieve a particular outcome, and the consequence of failing to achieve that outcome. Risk will be assessed at "High," "Moderate," or "Low" depending on the expected likelihood that there will be an adverse impact to management, performance, cost[,] or schedule after contract award.

Tab 16, AR 1166 (emphasis added).

### C.   The Transportation Security Administration's Request For Quotations For DOMAIN Support Services.

On May 17, 2017, the TSA issued a memorandum to document the method of releasing the RFQ. Tab 6, AR 179–80. The May 17, 2017 memorandum stated that the TSA would issue the RFQ using Federal Acquisition Regulation ("FAR") Part 8.4 procedures for Federal Supply Schedules. Tab 6, AR 179. The May 17, 2017 memorandum also stated that the TSA would issue the RFQ to sixteen companies that requested Sensitive Security Information vetting in response to Notice Number HSTS04-17-I-STAD01. Tab 6, AR 179–80.[7]

On June 14, 2017, the TSA issued the RFQ to the sixteen companies that requested Sensitive Security Information vetting.[8] Tab 7, AR 181–273. The RFQ included a Statement of Work ("SOW"), that provided the purpose, background, goals, scope, and objective of the BPA. Tab 7, AR 275–341. The SOW set forth eleven tasks required to perform DOMAIN support services.[9] Tab 7, AR 286–312. The Task 4 Integration requirement stated, in relevant part,

[t]he [c]ontractor shall engage directly with OEMs to develop/modify the TSE's system software to implement the STIP connectivity of their respective TSE to

---

[7]   On May 22, 2017, the TSA issued a memorandum to delegate authority from the Head Of Contracting Authority to the QSA. Tab 5, AR 177. The QSA has authority over a QSC, "that is responsible for reviewing the evaluation materials, including the tradeoff and award recommendation prepared by the [PET] and [the TET.]" Tab 5, AR 177.

[8]   The RFQ was amended three times. Tabs 12–14, AR 439–884. On June 7, 2017, the TSA issued Amendment A0001 to update Sections I, III, IV, VI, and VII and Attachments 1, 2, 4–8, and 12. Tab 12, AR 439–48. On June 8, 2017, the TSA issued Amendment A0002 to update Attachment 2 Order 1 Statement of Work-Dulles Pilot, Attachment 9 DHS Form 700-23-DHS Subcontracting Plan Review Checklist, and Attachment 17 Questions and Answers. Tab 13, AR 868. On June 16, 2017, the TSA issued Amendment A0003 to update Section VI Instructions, Conditions, and Notice to Quoter and Attachments 7 and 8. Tab 14, AR 884. All subsequent citations herein are made to the most recent version of the RFQ, Amendment A0003.

[9]   The eleven tasks included: (1) Development, Modernization, and Enhancement; (2) Steady-State Corrective Maintenance; (3) Steady-State Operational Support; (4) TSE Integration (the "Task 4 Integration requirement"); (5) TSE Endpoint Security Solution For Legacy TSE; (6) Enhanced Business Intelligence Platform; (7) System Environment Development And Support; (8) Cloud Migration And Support; (9) Transition Services; (10) Program Management; and (11) Engineering Services. Tab 7, AR 286–312.

STIP via TSANet in accordance with the requirements defined in the STIP [interface requirements document], associated Appendices, and other references. The Contractor shall be responsible for providing the services and software that are required to provide the integration between a specific TSE and STIP.  Integration in this [SOW] require[d] the contractor to combine the various components together into one system.  The contractor must incorporate the STIP agent software with the TSE vendor's TSE software.

The [c]ontractor shall directly engage and collaborate with TSE OEMs as they develop STIP functionality in accordance with the proposed integration approach put forward by the contractor.   [The] TSA require[d] business and technical solutions that integrate all TSE OEMs into the overall solution.  The TSE OEMs are listed in the Appendix.

Tab 7, AR 297–98.

The RFQ required quoters to demonstrate their understanding of the BPA SOW requirements by answering technical prompts set forth therein.  Tab 14, AR 1068.  In relevant part, the RFQ asked quoters,

[i]n support of SOW Task 4 "TSE Integration [requirement]," how does the [q]uoter propose to connect the various types of TSE to STIP?  [q]uoter shall address: Provide a technical architecture diagram that illustrates and explains the solution[,] including how connectivity will be provided locally to the TSE in the airport.

In support of SOW Task 4 "TSE Integration [requirement]," how does the [q]uoter propose to collaborate with the various OEMs of the TSE to enable STIP activity? Describe the proposed OEM integration method to decrease lengthy equipment-enablement timeframes, increase agility, and decrease the risks to the Government related to the dependences on the OEMS for their respective proprietary technologies.

Tab 14, AR 1069.

Consistent with the Quotation Evaluation Plan, the RFQ listed five evaluation factors by which proposals would be evaluated: (1) corporate experience; (2) technical approach; (3) staffing approach; (4) past performance; and (5) price.  Tab 14, AR 1075.  The RFQ explained that the "technical (non-price) evaluation factors . . . are listed in descending order of importance[, but] when combined, are significantly more important than the [p]rice [f]actor[.]   As quotes become more equal in their non-price factors, the price factor will become more important."  Tab 14, AR 1075.

The following Court Exhibit shows the evaluation factors by which the TSA would evaluate proposals for DOMAIN support services and their relative importance.



In addition, the RFQ provided that any proposal that was "assigned a rating of 'Unacceptable' for any [f]actor will be eliminated from further consideration." Tab 14, AR 1075.

### 1. Corporate Experience.

The RFQ provided that

[the TET] will evaluate the [q]uoter's previous relevant experience.[10]   The [q]uoter must submit at least one example of previous relevant experience, but not more than three examples of previous relevant experience.  The example(s) of previous relevant experience must either have been completed within the last two years (2) or be on-going.  The services outlined in the relevant experience must have been provided by the [q]uoter to a U.S. federal entity as a prime or first-tier subcontractor.

Tab 14, AR 1076 ("No substitution of Corporate Experience will be considered.").

---

[10]  The RFQ defined "relevant experience" as

experience performing tasks similar to those specified in the DOMAIN BPA SOW, including software development, integration of the software into a system, customizing business intelligence platform for specific and unique needs, and deploying the software.  Further, experience performing these tasks in an environment similar to that of an operational airport is preferred and will be considered when determining the relevancy of a [q]uoter's experience.

Tab 14, AR 983.

### 2.    Technical Approach.

The RFQ also provided that

> [the TET] will evaluate the [q]uoter's responses to each of the Technical Prompts . . . in the RFQ and will assess the extent to which the [q]uoter's technical approach demonstrates a thorough understanding of the complexity and magnitude of the requirements and an ability to successfully perform under the resultant BPA.

Tab 14, AR 1076.

### 3.    Staffing Approach.

In addition, the RFQ provided that the TET would evaluate the entirety of the staffing plan, including components, such as "Work Breakdown Structure," Key Personnel, descriptions of Non-Key Personnel positions, and Subcontracting Plan."  Tab 14, AR 1077.  The [Work Breakdown Structure] would be evaluated to determine "whether or not it [was] appropriate and necessary to successfully complete the requirements listed in the SOW[.]"  Tab 14, AR 1077.  In addition, the TET would "review the [q]uoter's level of effort and labor mix that was quoted for [the] BPA . . . ensure it is adequate to perform the work required in [the] BPA[.]  Tab 14, AR 1077.

### 4.    Past Performance.

The RFQ further provided that a quoter's past performance would be evaluated by "data obtained from the Government's databases, such as [the] Past Performance Information Retrieval System . . . , and the System for Award Management[.]  The Government may also evaluate other sources."  Tab 14, AR 1077.  If past performance information was not provided, the quoter would be assigned "[a] neutral rating [that] indicates neither a favorable nor unfavorable evaluation for this factor."  Tab 14, AR 1077.

### 5.    Price.

As to the price factor, the RFQ provided that

> [the PET] will review the [q]uoter's proposed labor rates to ensure they are equal to or less than the [q]uoter's published pricing in the [q]uoter's [General Services Administration ("GSA")] Schedule 70 Contract[.]   While GSA has already determined the schedule rates are fair and reasonable, the Government will evaluate and determine if the quoted rates, if discounted, are fair and reasonable. If the [q]uoter's GSA period of performance does not have option prices, the Government will evaluate the escalation of the [q]uoter's rates.

Tab 14, AR 1078.

The RFQ also stated that the total price would be determined by "summing the [contract line item number ("CLIN")] prices for all CLINs for the entire period of performance (including option periods)," except for CLINs 0008, 0011, 0012, and 0013, because the Government would not include those CLINs in the calculation of the total evaluated price.  Tab 14, AR 1078.

The RFQ advised that "adequate competition will be used to assess total evaluated price," but the PET "may also utilize one or more price analysis techniques set forth in the [FAR]." Tab 14, AR 1078. But, the PET would not conduct a price realism analysis.[11] Tab 14, AR 1078.

**D. Initial Proposals In Response To The Request For Quotations.**

Between June 19, 2017 and June 20, 2017, the QSA received proposals from: [redacted]; [redacted]; General Dynamics Mission Systems, Inc. ("GDMS"); [redacted]; Unisys Corporation ("Unisys"). Tabs 17–21, AR 1169–2109.

**E. The Price Evaluation Team's Initial Price Evaluation.**

On September 14, 2017, the PET issued a consensus report (the "Initial Price Evaluation") concluding that "the prices for the GD[MS], Unisys, and [redacted] labor rates for all years and the total evaluated price [were] determined to be fair and reasonable," but, noting that the PET "had concerns with the total evaluated prices for [redacted] and [redacted]." Tab 22, AR 2291.

**F. The Technical Evaluation Team's Initial Technical Evaluation.**

On September 19, 2017, the TET issued a technical evaluation (the "Initial Technical Evaluation"), that provided the following non-price ratings for the five quoters:

| **Quoter Name** | **Factor 1: Corporate Experience** | **Factor 2: Technical Approach** | **Factor 3: Staffing Approach** | **Factor 4: Past Performance** |
|---|---|---|---|---|
| [redacted] | Acceptable | Unacceptable | Not Rated | Not Rated |
| [redacted] | Acceptable | Acceptable | Acceptable | Acceptable |
| GD[MS] | Outstanding | Good | Acceptable | Acceptable |
| [redacted] | Good | Unacceptable | Not Rated | Not Rated |
| Unisys | Outstanding | Acceptable | Good | Acceptable |

Tab 23, AR 2292.

**G. The Quote Selection Committee's Down-Select Recommendation.**

On September 19, 2017, the QSC issued a Down-Select Recommendation eliminating [redacted] and [redacted] from further consideration, because they received "Unacceptable" Factor 2 ratings from the TET. Tab 24, AR 2351. The QSC recommended that the TSA "communicate with [redacted], GDMS, and Unisys to address Weaknesses and Risks that were identified by the TET as well as communications regarding their price quotes." Tab 24, AR 2351.

[11] A price realism analysis "considers whether an offeror's price is too low, such that it indicates a risk of poor performance and a lack of understanding of the solicitation requirements." *UnitedHealth Military & Veterans Servs., LLC v. United States*, 132 Fed. Cl. 529, 554 (Fed. Cl. 2017).

**H.     The Transportation Security Administration's Communications With General Dynamics Mission Systems, Inc. And Unisys Corporation.**

On September 22, 2017, the TSA sent "written communications for non-price and price factors" to ████, GDMS, and Unisys.  Tabs 26–28, AR 2389–2410.

The written communications instructed GDMS to submit a revised quote that addressed the following questions related to Factor 2, Technical Approach:

1. Please explain in depth how the BluAura device is functioning including a description of how the device provides full sanitization of the network traffic from [TSE] to the TSANet network. The description should illustrate which software is used for which process in protecting the TSANet network traffic, and how these processes align to the 9 cyber security controls.

2. Please explain in detail how the BluAura device is comparable to the [WTMD] in both size and form, operating systems, and hardware platform.

Tab 26, AR 2390.

The written communications instructed Unisys to submit a revised quote that addressed the following questions related to Factor 2, Technical Approach:

1. Please provide the list of software Unisys anticipates using for this BPA and note whether the software is [commercial off the shelf], open-source, or proprietary.

2. How many [TSE] . . . ████████████████████████████

   a. How many ████████ will [Unisys] be using and where are they located?

   b. How many ████████ will be on ████████████?

   c. Are they located centrally or by the checkpoint?

   d. What are the origination and termination points in reference to the IP-SEC tunnel?

3. How would Unisys account for TSEs located outside of the checkpoint? For example, many Explosive Detection Systems are located outside the visible checkpoints and/or in separate, dedicated facilities from the airports?

4. How would Unisys enable the TSE to communicate with the ███████ . . . STIP [c]lient[12] since the quoted approach is to have the STIP [c]lient ███████████████?

5. How does the proposed technical architecture enable the Transportation Security Officers [("TSOs")] . . . to log in to the TSEs locally using their PIV cards?

6. What is [Unisys]'s contingency operation failover at each ███████ should the ███████ go down?

    a. What is [Unisys]'s mitigation for a hardware failure?

Tab 27, AR 2395–96.

## I.    Revised Proposals In Response To Communications With The Transportation Security Administration.

Between October 4, 2017 and October 5, 2017, the QSA received revised proposals from ███, GDMS, and Unisys. Tabs 31–33, AR 2415–3532.

## J.    The Technical Evaluation Team's Revised Technical Evaluation.

On October 26, 2017, the TET issued an addendum to the Initial Technical Evaluation (the "Revised Technical Evaluation"). Tab 34, AR 3533–90.

As to GDMS's technical approach, the Revised Technical Evaluation stated:

The [TET] determined the one (1) Risk was not mitigated and one (1) Weakness was not resolved. The TET maintained the rating of "Good" for Factor 2, Technical Approach. Based on the Addendum 0001 Evaluation, the TET noted six (6) Strengths, one (1) Risk, and one (1) Weakness. The Risk to the [TSA] remains low.

Tab 34, AR, 3559 (emphasis omitted).

As to the "Risk" of GDMS's technical approach, the Revised Technical Evaluation stated:

Anti-virus applications (including Symantec) does not have a high success rate of completely identifying malicious activity inline on packets (as in this use case). Most of the success of the anti-virus products [is] in conducting scans of stored files, and scanning info at file executable runtime. It is not clear that this "blacklist" approach will be effective in inspecting the packets, as fully inspecting the "payload" independently of the full network protocol stack is not typically a key or an effective function of the end point protection suites. Further, the explanation adds to the confusion of what the whitelist is actually performing – if the "payload inspection protects against unknown forms of malware (whitelist)" – this is not

---

[12] A "client" is "a program that is capable of obtaining a service provided by another program." New Oxford American Dictionary (3d ed. 2010).

performing the function that is later indicated that "only information passed to and from the TSE is that which aligns with the data schem[e] specified in the STIP [interface requirements document]" as malware detection and ensuring only the correct information is able to be passed to the TSE is not the same.  [GDMS] does not provide additional information as to how this whitelist functions.  The additional information that was provided has not resulted in a clearer explanation of their offering and continues to add risk to the [TSA] with their approach.

*The TET does not consider this Risk to be mitigated.*

Tab 34, AR 3564 (emphasis in original).

As to the "Weakness" of GDMS's technical approach, the Revised Technical Evaluation stated:

The TET's original concern rose out of [GDMS]'s original response to Technical Prompt 6C that states: "Describe in detail the technical specifications of the proposed ███████████████ as well as the testing/validation that the solution has gone through in an operational environment similar to that of TSA."  [GDMS] had originally submitted that the testing/validation done on WTMD-A was sufficiently representative of the BluAura devices in TSA's operational environment.  The TET believed otherwise and wanted [GDMS] to further strengthen the compatibility case between WTMD-A and BluAura.  However, [GDMS]'s revised response reinforces the TET's original concern rather than dissipates it by agreeing that the BluAura is functionally and physically different from the WTMD-A devices.

*The TET does not consider this Weakness to be resolved.*

Tab 34, AR 3566 (emphasis in original) (quoting Tab 7, AR 265).

As to Unisys's technical approach, the Revised Technical Evaluation stated:

The TET maintained the rating of "Acceptable" for Factor 2, Technical Approach. The TET considers one Weakness (1) to be resolved through the revised proposal. However, the TET doesn't consider the three remaining Weaknesses (2-4) to be resolved; in the final tally, the TET assigned two (2) Strengths and three (3) Weaknesses.  The TET continues to have concerns over the ████████████ ████████████████ and post-implementation operational model that would be required for the ██████████████████ needed to implement [Unisys]'s proposed connectivity solution.  There are no noted Deficiencies.  Risk to the [TSA] remains Moderate.

Tab 34, AR 3576 (emphasis omitted).

The first assigned "Weakness" as to Unisys's technical approach was explained in the Revised Technical Evaluation, as follows:

> The Government asked, "Please provide the list of software Unisys anticipates using for this BPA and note whether the software is [commercial off the shelf], open-source, or proprietary." [Unisys] responded by providing a table [F2-1] that lists the software that Unisys will use for development, integration and test.
>
> *The TET considers this Weakness to be resolved.*

Tab 34, AR 3578 (emphasis in original) (quoting Tab 34, AR 3578).

The second assigned "Weakness" as to Unisys's technical approach was explained in the Revised Technical Evaluation, as follows:

> While [Unisys] addresses the redundancy and recovery issue of the proposed ███████████████ in general terms, the original flaw noted by the TET remains in that the proposed architecture ████████████████ failure, and that the impact of a ██████████ failure would be devastating, throwing hundreds of TSE offline and delaying the screening operations for the checkpoints whose TSEs would be affected. With the large volume of passengers and bags that're screened every day, even a 99.9% availability – translated across the whole TSA enterprise – represents a significant amount of potential downtime for checkpoints across the country.
>
> *The TET does not consider this Weakness to be resolved.*

Tab 34, AR 3579 (emphasis in original).

The third assigned "Weakness" as to Unisys's technical approach was explained in the Revised Technical Evaluation, as follows:

> [Unisys] has stated that they will be purchasing ██ servers to cover 450 airports. Based on this, the TET determine[d] that [Unisys] plans ████████████████ at most of the airports, which does not lend to the understanding how the ████████ Server is architected as a ████████████ as stated.



> The TET is further concerned that this technical approach presents concerns for smaller airports that have a few TSEs and no on-premise server infrastructure; [the] TSA would need to confirm that all airports could support this solution. This concern is not limited to smaller airports. Even at larger airports, [the] TSA does not own, allocate, or control the IT closet and rack spaces that would need to be made available for the provisioning of multiple ████████ servers that would meet the aforementioned power, network, physical security, and environmental controls. In fact, TSA has many outstanding Department of Homeland

> Security . . . Office of Inspector General . . . recommendations that speak specifically to [the] TSA's inadequacy in addressing the [TSA's] weaknesses regarding [the] controls over [the] IT infrastructure at the airports; this solution may potentially add to that issue.
>
> * * *
>
> [Unisys] has added additional complexity with the introduction[] of the Microbridge, which wasn't previously mentioned, and the Stealth [redacted], which may increase operational and maintenance complexity of keeping these different pieces of equipment operational, which would increase the risk to the [TSA]. This revised response potentially increases [Unisys]'s ability to successfully deliver their solution to difficult to access locations in an airport.
>
> *The TET does not consider this Weakness to be resolved.*

Tab 34, AR 3581–82 (emphasis in original).

The fourth assigned "Weakness" as to Unisys's technical approach was explained in the Revised Technical Evaluation, as follows:

> The TET believes that [redacted] PIV authentication should not be used to [redacted] Furthermore, "Upon logout by the [TSOs,] the [redacted] will be shut down and disable [redacted] would be very problematic for operational use while a checkpoint is operational. This configuration would not allow [redacted] The [redacted] login to these [redacted] is also not aligned with [the] TSA's Information Assurance [P]olicy [redacted] [Unisys] is proposing an option that would not easily allow [redacted] that needs to be leveraged to conduct their work, unless the screening is performed away from the TSE at an additional separate workstation that can connect to the STIP [redacted] associated to that TSE.
>
> *The TET does not consider this Weakness to be resolved.*

Tab 34, AR 3583 (emphasis in original) (quoting Tab 32, AR 3240).

### K. The Price Evaluation Team's Revised Price Evaluation.

On October 26, 2017, the PET issued an addendum to the Initial Price Evaluation (the "Revised Price Evaluation"). Tab 35, AR 3591–3617. The Revised Price Evaluation stated that the total revised quote was $95,387,463.96 for [redacted]; $180,122,665.74 for GDMS; and $30,039,732.85 for Unisys. Tab 35, AR 3614–15. The Revised Price Evaluation concluded that "each [q]uoter's labor rates for all years and the total evaluated price [are] determined to be fair and reasonable." Tab 35, AR 3617.

### L.    The Quote Selection Committee's Trade-Off Recommendation.

On October 26, 2017, the QSC issued a Trade-Off Recommendation that compared each quote and was provided to the QSA.  Tab 36, AR 3618–27.  Therein, the QSC compared GDMS and Unisys and determined that both "received identical ratings for each non-price evaluation factor with the exception of Factor 2, Technical Approach.  Factor 2 was the second most important non-price evaluation factor."  Tab 36, AR 3622.  The QSC also stated that

> [w]hile the overall evaluation scheme weigh[ed] the non-price factors, when combined, as significantly more important than price, this does not mean that price is simply ignored because it is given less weight.  In fact, where the [G]overnment recommends award to a higher-priced contractor it must document that the perceived benefits of the higher priced proposal merits the additional cost.

Tab 36, AR 3622.

In addition, the QSC found that GDMS's quote included technical benefits that exceeded those of Unisys, including "that from an implementability and maintenance perspective, GD[MS]'s proposed connectivity and endpoint security solution poses significantly less risk to the [TSA] than Unisys'[s] solution[.]"  Tab 36, AR 3622.  The QSC provided the following reasons for that finding:

1. GD[MS]'s solution would not require restructuring of [the] TSA's existing network architecture at the airports – it will work with the existing network infrastructure.   On the other hand, Unisys'[s] proposed connectivity architecture introduces ████████ and potential networking wiring at checkpoints that would have to [be] installed and maintained post implementation.

2. GD[MS]'s BluAura solution would require a smaller footprint – limited to being attached to the TSE devices – at the checkpoint/airport environment compared to Unisys'[s] solution that would require installation of ████████ ████████.

3. GD[MS]'s BluAura solution would not require changes to how the TSO would have to log into the TSE using PIV, while Unisys'[s] solution would potentially require changes and/or steps to how ████████████████ ████.

Tab 36, AR 3622.

The QSC concluded, however, that,

> [the TSA] must document, but is not required to quantify the benefits of the GD[MS] quote over Unisys.  It is pretty clear, however, that the benefits of the GD[MS] quote do not approach the $150,082,932.89 differential in price.  In short,

[the] TSA could not identify close to $150,082,932.89 in technical benefits that
would justify paying this price premium.  As such, when comparing GD[MS] and
Unisys, Unisys represents [the] best value to the Government. GD[MS] rating of
'Good' for Factor 2 does not merit a $150,082,932.89 price premium.

Tab 36, AR 3622.

> ### M.  The Quote Selection Authority's Quote Selection Decision.

On October 27, 2017, the QSA issued the Quote Selection Decision, based on a
"comparative assessment of the quotes against the quote selection criteria in the [RFQ]." Tab 38,
AR 3644–49.  The QSA compared each quote.  Tab 38, AR 3645–48.  The Quote Selection
Decision provided the following tradeoff analysis for GDMS and Unisys:

| Quoter Name | Factor 1: Corporate Experience | Factor 2: Technical Approach | Factor 3: Staffing Approach | Factor 4: Past Performance | Factor 5: Price (Total Evaluated Price) |
|---|---|---|---|---|---|
| GD | Outstanding | Good | Good | Acceptable | $180,122,665.74 |
| Unisys | Outstanding | Acceptable | Good | Acceptable | $30,039,732.85 |

GD[MS] and Unisys received nearly identical ratings.  The only difference is that
GD[MS] received a higher rating, having received a rating of 'Good' versus the
Unisys rating of 'Acceptable', for Factor 2.

The TET identified benefits with the GD[MS] quote.  From an implementability
and maintenance perspective, GD[MS]'s proposed connectivity and endpoint
security solution poses significantly less risk to the [TSA] than Unisys'[s] solution
for the following reasons:

1.  GD[MS]'s solution would not require restricting of [the] TSA's existing
    network architecture at the airports – it will work with the existing network
    infrastructure. On the other hand, Unisys'[s] proposed connectivity architecture
    introduces ███████████ and potential networking wiring at checkpoints
    that would have to [be] installed and maintained post[-]implementation.

2.  GD[MS]'s BluAura solution would require a smaller footprint – limited to
    being attached to the TSE devices – at the checkpoint/airport environment
    compared to Unisys'[s] solution that would require installation of ███████
    ███████████.

3.  GD[MS]'s BluAura solution would not require changes to how the TSO would
    have to log into the TSE using PIV, while Unisys'[s] solution would potentially
    require changes and/or steps to how ████████████████████████████
    █████.

> [The TSA] must document, but is not required to quantify the benefits of the GD[MS] quote over Unisys.  However, taking the price factor into consideration, Unisys quoted a total evaluated price of $30,039,732.85, which is $150,082,932.89 less (-83%) than the total evaluated price of $180,122,665.74 that was quoted by GD[MS].  Although the GD[MS] quote offered benefits to the Government, it is pretty clear that the benefits of the GD[MS] quote do not approach the $150,082,932.89 differential in price.  In short, [the] TSA could not identify close to $150,082,932.89 in technical benefits that would justify paying this price premium.  As such, when comparing GD[MS] and Unisys, Unisys represents [the] best value to the Government.  GD[MS]'s rating of 'Good' for Factor 2 does not merit a $150,082,932.89 price premium.

Tab 38, AR 3646.

In sum, the Quote Selection Decision "determined that Unisys represents the best overall value to the Government," and the DOMAIN BPA was awarded to Unisys.  Tab 38, AR 3648.

## II.   PROCEDURAL HISTORY.

On January 9, 2018, GDMS filed a Complaint ("Compl."), under seal, in the United States Court of Federal Claims alleging that the TSA improperly awarded the BPA to Unisys for DOMAIN Support Services under the RFQ, because the TSA: (1) failed to evaluate the quoters' technical approaches on a "common basis" (Compl. ¶¶ 72–79); (2) failed to evaluate the quoters' pricing information on a "common basis" (Compl. ¶¶ 80–86); (3) failed to conduct discussions with fundamental fairness (Compl. ¶¶ 87–91); (4) failed to recognize the "High" risk associated with Unisys's proposal (Compl. ¶¶ 92–95); and (5) conducted an unreasonable evaluation of GDMS's staffing approach (Compl. ¶¶ 96–99).  ECF No. 1.

On that same day, GDMS filed a Motion For Preliminary Injunction (ECF No. 4), and Memorandum Of Points And Authorities In Support Of The Motion For Preliminary Injunction, under seal.  ECF No. 5.  GDMS also filed a Motion For Protective Order, that the court granted.  ECF Nos. 6, 9.  On that same day, the court convened a telephone status conference.

On January 10, 2018, Unisys filed an Unopposed Motion To Intervene.  ECF No. 13.  On that same day, the court issued an Order granting Unisys's Unopposed Motion To Intervene, pursuant to Rule of the United States Court of Federal Claims ("RCFC") 24(a)(2).  ECF No. 15.

On January 16, 2018, GDMS filed, under seal, a Joint Notice Of Stay To Transition Activities And Proposed Schedule informing the court that the Government "agreed to a voluntary stay of all transition activities in preparation for performance of the DOMAIN BPA through February 23, 2018, with the exception of vetting activities relating to [Unisys's] personnel, which the parties agree[d] may continue in the interim."  ECF No. 20 at 1.  On that same day, the court issued a Scheduling Order.  ECF No. 21.

On January 19, 2018, the Government filed an Unopposed Motion For Protective Order Pertaining To Sensitive Security Information.  ECF No. 22.  On that same day, the Government filed an Unopposed Motion For Leave To File The Administrative Record On DVD.  ECF No. 23.  The court also issued an Order granting the Government's Unopposed Motion For Protective Order

Pertaining To Sensitive Security Information.  ECF No. 24.  In addition, the court issued an Order granting the Government's Motion For Leave To File The Administrative Record On DVD.  ECF No. 25.  The Government filed a Notice informing the court that it filed the Administrative Record on DVD.  ECF No. 26.

On January 26, 2018, the Government filed a Consent Motion For Leave To Correct The Administrative Record "to remove two documents containing information protected by the attorney/client privilege that were incorrectly included."  ECF No. 29 at 1.  On that same day, the court issued an Order granting the Government's Consent Motion For Leave To Correct The Administrative Record.  ECF No. 30.  In addition, GDMS filed, under seal, a Motion For Judgment On The Administrative Record ("Pl. Br.").  ECF No. 31.

On February 2, 2018, the Government filed a Notice Of Filing Of Corrected Administrative Record informing the court that the documents protected by the attorney/client privilege were removed from the Administrative Record.  ECF No. 33.  The Government also filed a Response And Cross-Motion For Judgment On The Administrative Record ("Gov't Br.").  ECF No. 34.  On that same day, Unisys filed a Response And Cross-Motion For Judgment On The Administrative Record ("Int. Br.").  ECF No. 35.

On February 9, 2018, GDMS filed a Reply In Support Of The Motion For Judgment On The Administrative Record And Response To The Defendants' Cross-Motions For Judgment On The Administrative Record ("Pl. Reply").  ECF No. 36.

On February 16, 2018, the Government filed a Reply To GDMS's Response.  ECF No. 37.  On that same day, Unisys filed a Reply to GDMS's Response.  ECF No. 38.

On February 23, 2018, the court convened an oral argument at the United States Court of Federal Claims.  ECF No. 41 ("2/23/18 TR").  On that same day, GDMS filed, under seal, a Motion For Temporary Restraining Order.  ECF No. 39.

On March 1, 2018, the Government filed a Response to the February 23, 2018 Motion For Temporary Restraining Order.  ECF No. 42.  On March 2, 2018, the Government filed an amended Response to the February 23, 2018 Motion For Temporary Restraining Order.  ECF No. 43.

On March 2, 2018, the court issued an Order, under seal, granting the February 23, 2018 Motion For Temporary Restraining Order.  ECF No. 44.  The March 2, 2018 Order enjoined performance under the RFQ for a period of 14 days, *i.e.*, through March 16, 2018.  ECF No. 44.  On March 7, 2018, the court issued the public version of the March 2, 2018 Order.  ECF No. 46.

On March 29, 2018, the Government filed a Notice stating that the TSA "intends to resume performance of [the BPA] . . . on Monday, April 2, 2018."  ECF No. 47.

### III.   DISCUSSION.

#### A.   Subject Matter Jurisdiction.

Subject matter jurisdiction is a threshold issue that a court must determine at the outset of a case.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) ("The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884))).

Pursuant to the Administrative Dispute Resolution Act of 1995, the United States Court of Federal Claims has jurisdiction

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency or proposals for a proposed contract or to a proposed award of a contract or any alleged violation of statute or regulation *in connection with a procurement or a proposed procurement*. . . . [T]he United States Court of Federal Claims . . . shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1) (emphasis added).

In this case, the January 9, 2018 Complaint alleges that the TSA improperly awarded a BPA to Unisys for DOMAIN Support Services under RFQ No. HSTS04-17-Q-CT2506, because the TSA: (1) failed to evaluate the quoters' technical approaches on a "common basis" (Compl. ¶¶ 72–79); (2) failed to evaluate the quoters' pricing information on a "common basis" (Compl. ¶¶ 80–86); (3) failed to conduct discussions with fundamental fairness (Compl. ¶¶ 87–91); (4) failed to recognize the "High" risk associated with Unisys's proposal (Compl. ¶¶ 92–95); and (5) conducted an unreasonable evaluation of GDMS's staffing approach (Compl. ¶¶ 96–99).

For these reasons, the court has determined that it has subject matter jurisdiction, under 28 U.S.C. § 1491(b)(1), to adjudicate the bid protest claim alleged in the January 9, 2018 Complaint.

#### B.   Standing.

##### 1.   General Dynamics Mission Systems, Inc.'s Complaint.

The January 9, 2018 Complaint alleges that GDMS "has standing as an interested party to file this bid protest.  GDMS is an actual [quoter] that submitted a timely proposal for the subject procurement, and [GDMS's] direct economic interests are affected by the award of the [BPA] to Unisys."  Compl. ¶ 16 (citing 28 U.S.C. § 1491(b)(1)).

##### 2.   General Dynamics Mission Systems, Inc.'s Argument.

GDMS argues that GDMS is a quoter "that submitted a timely proposal for the subject procurement, and the award to Unisys affects GDMS's direct economic interests."  Pl. Br. at 3–4.  In a footnote, GDMS adds that

[the] TSA sought dismissal of GDMS's previous protest of this procurement before the General Accountability Office ("GAO") on, *inter alia*, the ground that GDMS was not an interested party. *See* [Tab 44, AR 4211]. [The] TSA asserted that another quoter-███–that was substantially lower rated technically than GDMS would have been next in line for award had award not been made to Unisys. *Id.* at AR 4212. In support of this assertion, [the] TSA attached an excerpt from [the] [Q]uote [S]election [D]ecision that unequivocally confirmed that, as here, ███ quote did not meet the requirements of the RFQ: By this statement, ███, in effect, implies that it will not connect any legacy TSE that the relevant OEM does not update to meet the cybersecurity requirements or can be reclassified. This was noted as a [D]eficiency by the TET. *This approach does not fully serve the purpose of this contract* because the intent was for the DOMAIN contractors to act as an integrator who would be responsible to work directly with the OEMs to enable connectivity to TSANet. *See* [Tab 38, AR 3648]. GAO rejected [the] TSA's claim that GDMS was not an interested party. The [c]ourt should do the same if the Government attempts to raise that argument again here.

Pl. Br. at 4 n.2 (emphasis in original).

### 3.    The Government's Response.

The Government responds that, to satisfy the requirements of standing a protestor must establish it: "(1) is an actual or prospective bidder[;] and (2) possesses the requisite direct economic interest." Gov't Br. at 13 (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009)). To satisfy the "direct economic interest" requirement in a post-award bid protest, the protestor "must show that there was a substantial chance it would have received the contract award[,] but for the alleged error in the procurement process." Gov't Br. at 13 (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (internal quotations omitted)). The protestor "lacks a 'direct economic interest[,]' if the litigation could not put it in a position for an award, *e.g.*, if one award is contemplated and the protestor ranked below second in the evaluations." Gov't Br. at 13 (citing *United States v. IBM Corp.*, 892 F.2d 1006, 1011–12 (Fed. Cir. 1989)).

In this case, the QSA found the quotes of Unisys and ███ "to be more advantageous to the Government than GDMS in [the] best value tradeoffs." Gov't Br. at 12 (citing Tab 38, AR 3646–48). Therefore, to have standing, GDMS must establish that the QSA's decision with respect to both Unisys and ███ was "(1) arbitrary, capricious, an abuse of discretion or not otherwise in accordance with law[;] and (2) prejudicial to the outcome of the procurement[.]" Gov't Br. at 12. With regard to ███, "GDMS's entire argument . . . is contained in footnote 2 on page 4 of [GDMS's] brief," arguing "(1) that GAO already ruled on the issue[;] and (2) ███ quote did not meet the requirements of the RFQ." Gov't Br. at 13 (citing Pl. Br. at 4 n.2 (footnote omitted)). But, the GAO did not rule on whether GDMS had standing; instead, GDMS withdrew the GAO bid protest. Gov't Br. at 13 n.1 (citing Tab 44, AR 3678–4385). But, even if the GAO ruled on this issue, the court would not be bound by the GAO's decision. Gov't Br. at 13–14. Likewise, GDMS's argument that ███ quote did not meet the requirements of the RFQ "must also fail[,] because the Deficiency identified by GDMS in footnote 2 was already considered by [the] TSA as a Deficiency in ███ quotation during the technical evaluation . . . and considered

in the best valuation determination by the QSA[.]" Gov't Br. at 14 (citing Tab 34, AR 3545; Tab 38, AR 3648). In sum, "the TET correctly noted ██████ failure to meet this requirement] as a Deficiency . . . in Factor 2 . . . and correctly applied the adjectival rating 'Acceptable,' because 'Acceptable' allows that '[t]here may be Strengths, but offset by Weaknesses or Deficiencies.'" Gov't Br. at 14–15 (citing Tab 16, AR 1166–67). Therefore, GDMS cannot demonstrate that the "TSA's decision to place ████ second in line for the BPA was an abuse of discretion[, so] GDMS lacks standing to maintain this [bid] protest." Gov't Br. at 15.

### 4. General Dynamics Mission Systems, Inc.'s Reply.[13]

GDMS replies that "a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." Pl. Reply at 4–5 (quoting *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1329 (Fed. Cir. 2011) (internal quotation marks and citation omitted)). In this case, the "TSA relaxed the RFQ's requirements in [the] evaluation of ████ quote" and "[b]ut for this improper relaxation of the requirements, GDMS would have been in line for award." Pl. Reply at 4. Specifically, the TSA rated ████ quote "Acceptable," even though the TSA's evaluators found that it failed to meet the purpose of the procurement:

> ████ stated that "OEMs will not cooperate/collaborate, their noncompliant TSEs will be isolated in the legacy TSE environment. Should an OEM fail to receive a [National Institute of Standards and Technology] classification, the TSEs will also be isolated in the legacy TSE environment." By this statement, ████, in effect, implies that it will not connect any legacy TSE that the relevant OEM does not update to meet the cybersecurity requirements or can be reclassified. This was noted as a [D]eficiency by the TET. This approach does not fully serve the purpose of this contract[,] because the intent was for the DOMAIN contractors to act as an integrator who would be responsible to work directly with the OEMs to enable connectivity to TSANet.

Tab 38, AR 3648 (quoting Tab 33, AR 3372).

Despite these findings, the TSA determined that, "[a]lthough the GD[MS] quote offers technical benefits compared to the ████ quote, the technical benefits do not justify the price premium of $84,735,201.78 over ████." Pl. Reply at 5 (quoting Tab 38, AR 3648). Under *Allied Technical Group*, however, the "TSA could not properly award to ████, even with [the] price advantage." Pl. Reply at 6.

---

[13] Unisys's February 2, 2018 Response, the Government's February 16, 2018 Reply, and Unisys's February 16, 2018 Reply do not address whether GDMS has standing to maintain this bid protest.

### 5.    Relevant Precedent.

"Standing is a threshold jurisdictional issue." *Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002). The party "invoking federal jurisdiction bears the burden of establishing the[ ] elements [of standing]." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). To establish standing in a bid protest case, the complaint must allege sufficient facts to establish that the plaintiff: (1) is an interested party; and (2) was prejudiced by alleged errors in the procurement process. *See Myers*, 275 F.3d at 1370 (holding that standing under § 1491(b)(1) is limited to "interested parties"); *see also id.* ("prejudice (or injury) is a necessary element of standing").

The United States Court of Appeals for the Federal Circuit has held that the term "interested party" in 28 U.S.C. § 1491(b)(1), should be "construed in accordance with the Competition in Contracting Act." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing 41 U.S.C. §§ 3551–3556). Therefore, to qualify, as an "interested party," the complaint must allege sufficient facts to establish that: (1) the plaintiff "was an actual or prospective bidder or offeror;" and (2) the plaintiff "had a direct economic interest in the procurement or proposed procurement." *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008). To establish "a direct economic interest, the [plaintiff] must show that it had a 'substantial chance' of winning the contract." *See Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012).

To establish prejudice, the plaintiff "must show that there was a substantial chance it would have received the contract[,] but for the [G]overnment's error in the bid process." *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1380 (Fed. Cir. 2009); *see also Galen Med. Assocs., 369 F.3d at 1331* ("To establish prejudice, the [plaintiff] must show that there was a substantial chance it would have received the contract award[,] but for the error.") (citation omitted). The United States Court of Appeals for the Federal Circuit has held that the test for prejudice "is more lenient than showing actual causation," so the plaintiff need not "show[] that[,] but for the errors[, it] would have *won* the contract." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005) (emphasis added). Instead, the complaint must allege that the plaintiff has a "greater than insubstantial chance of securing the contract[,] if successful on the merits of the bid protest." *See Info. Tech. & Applications Corp.*, 316 F.3d at 1319. "In other words, the protestor's chance of securing the award must not have been insubstantial." *Id*.

### 6.    The Court's Resolution.

The January 9, 2018 Complaint alleges that GDMS was an actual bidder with a substantial chance of being awarded the BPA, because GDMS's quote received eligible ratings for each of the non-price evaluation factors and GDMS's total evaluated price was below the estimated value of the BPA. Compl. ¶¶ 43–44 ("GDMS's quote received a rating of Outstanding for Factor 1, 'Corporate Experience,' a rating of Good for Factor 2, 'Technical Approach,' a rating of Good for Factor 3, 'Staffing Approach,' and a rating of Acceptable for Factor 4, 'Past Performance.'"); *see also* Compl. ¶¶ 43–44 ("[T]he estimated value of the BPA was $250,000,000 . . . [and] GDMS's total evaluated price was $180,122,665.74.").

The Government insists that GDMS does not have a "direct economic interest" in this procurement, because it was ranked third in the TSA's evaluations. Gov't Br. at 13 (citing *IBM*, 892 F.2d at 1011–12). The Government's reliance on *IBM*, however, is misplaced, because the evaluation method used in that procurement was "sealed bidding," where price is the determinative factor. *See IBM*, 892 F.2d at 1011 ("the bids materially differ only as to price"); *see also* 48 C.F.R. § 14.101(e) (requiring that "an award will be made with reasonable promptness to that responsible bidder whose bid, conforming to the invitation for bids, will be most advantageous to the Government, *considering only price and the price-related factors* included in the invitation" (emphasis added)). Under a "sealed bidding" scenario, if a protestor has the lowest price, but otherwise is ineligible, the offeror with the next-lowest price becomes the presumptive awardee. *See* 48 C.F.R. § 14.101(e). As the United States Court of Appeals for the Federal Circuit has recognized:

> Where, as here, every disappointed bidder on a formally-advertised sealed-bid procurement offers *essentially the same package of products and services, and the bids materially differ only as to price*, . . . and there is no reason to believe that the second-lowest bid is not responsive, only the second-lowest bidder has a direct economic interest in the award of the contract.

*IBM*, 892 F.2d at 1011 (emphasis added).

In this case, the DOMAIN RFQ was governed by FAR Part 8, but since that regulation does not include a "tradeoff" evaluation method the TSA employed one that conformed with FAR Part 15. *Compare* Tab 14, AR 1075 ("The Government will award a contract resulting from this solicitation to the responsible [q]uoter whose offer conforming to the solicitation will be most advantageous to the Government, price and other factors considered."), *with* 48 C.F.R. § 15.101-1 ("This process permits tradeoffs among cost or price and non-cost factors and allows the Government to accept other than the lowest priced proposal."). And, the RFQ explained that the "technical (non-price) evaluation factors[,] . . . when combined, are significantly more important than the [p]rice [f]actor[.]" Tab 14, AR 1075. Therefore, *IBM* is inapplicable, because the quotations submitted in this case in response to the DOMAIN RFQ did not "materially differ only as to price." *See IBM*, 892 F.2d at 1011.

In *Clarke v. Securities Industry Association*, 479 U.S. 388, 399 (1987), the United States Supreme Court held that "[t]he 'zone of interest' test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision." *Id.* Accordingly, in the context of a bid protest, the United States Court of Federal Claims has determined that a protestor is within the "zone of active consideration," if it was "the incumbent contactor and was a finalist for the contract award." *Sci. & Mgmt. Res., Inc. v. United States*, 117 Fed. Cl. 54, 62 (Fed. Cl. 2014).

In this case, GDMS is an incumbent contactor and, together with Unisys and ▓▓▓▓, was a finalist for an award to provide DOMAIN support services to the TSA. Compl. ¶ 4; Tab 24, AR 2349–52 (TSA Down-Select Recommendation determining that "▓▓▓▓ and ▓▓▓▓ will be eliminated from further consideration" and "it would be advantageous to the Government to

communicate with ███, GD[MS], and Unisys to address Weaknesses and Risks that were identified by the TET as well as communications regarding their price quotes"). Therefore, GDMS was within the "zone of active consideration" for award of the BPA, but for the TSA's allegedly unlawful tradeoff analysis. For these reasons, the court has determined that GDMS has a "direct economic interest" in this procurement.

The January 9, 2018 Complaint also alleges that GDMS was prejudiced by the TSA's decisions, because GDMS had a substantial chance of receiving the BPA award, but for the TSA's allegedly unlawful tradeoff analysis. Compl. ¶ 12. Specifically, the TET prejudiced GDMS by waiving the technical requirements of the RFQ in evaluating Unisys's proposal. Compl. ¶ 75. This is so, because the TET could not have determined that Unisys's proposal satisfied the Task 4 Integration requirement of the RFQ, as the total evaluated price of Unisys's proposal did not include all the costs necessary to satisfy "the requisite TSE integration, testing[,] and certification activities." Compl. ¶ 77. In addition, the January 9, 2018 Complaint alleges that the PET prejudiced GDMS by failing to ensure that the quotes were considered on a "common basis." Compl. ¶ 83. In contrast, GDMS complied with the RFQ by providing a quoted price for each CLIN listed in Attachment 6 of the RFQ. Compl. ¶ 82. By faithfully following the RFQ, "GDMS's total evaluated price was nearly six times higher than Unisys's" total evaluated price. Compl. ¶ 83 (emphasis omitted). Therefore, Unisys's proposal could not have complied with the RFQ and the PET could not have considered the quotations submitted by GDMS and Unisys on a "common basis." Compl. ¶ 83. If the "TSA [had] taken steps to ensure that GDMS and Unisys were competing on a common basis, there would not have been such a substantial price differential, and GDMS would likely have been awarded the contract." Compl. ¶ 86. Therefore, individually and collectively, the alleged errors committed by the TET and the PET evidence "substantial prejudice." Compl. ¶ 12. For these reasons, the court also has determined that GDMS had a substantial chance of being awarded the BPA, but for the allegedly unlawful decisions of the TSA that prejudiced GDMS.

And, for both of these reasons, the court has determined that the January 9, 2018 Complaint alleges sufficient facts to show that GDMS has satisfied the requirements of standing to seek an adjudication of the claims asserted therein.

### C. Whether The Transportation Security Administration's Award To Unisys Corporation Violated The Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

#### 1. Standard Of Review For Judgment On The Administrative Record, Pursuant To RCFC 52.1.

The United States Court of Appeals for the Federal Circuit requires that the court treat a motion for judgment on the administrative record, as if it were an expedited trial on the record. *See Bannum*, 404 F.3d at 1356. Therefore, a dispute about material issues of fact does not prohibit the court from granting a RCFC 52.1 motion. *Id*. at 1354. Instead, the court can base a determination on "factual findings from the [Administrative R]ecord evidence." *Id*.

2.      **Standard Of Review For A Bid Protest.**

The Administrative Dispute Resolution Act, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), amended the Tucker Act, 28 U.S.C. 1491, to authorize the United States Court of Federal Claims to adjudicate bid protests under the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"); *see also Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (citations omitted)).

Therefore, the trial court's first responsibility in a bid protest is to determine whether a federal agency violated a federal statute or procurement regulation and whether any such violation was "clear and prejudicial." *Axiom Res. Mgmt. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (holding that "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations" (internal quotation marks and citations omitted)).

If no "clear and prejudicial" violations of law or regulation are determined, the court next is required to determine whether the agency decision evidences a rational basis. *See Savantage Fin. Servs. Inc. v. United States*, 595 F.3d. 1282, 1286 (Fed. Cir. 2010) (holding that a court "must sustain an agency action[,] unless the action does not evidence rational reasoning and consideration of relevant factors" (quotations omitted)); *see also Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974) (holding that a court "will uphold a decision of less than ideal clarity[,] if the agency's path may reasonably be discerned"). In this regard, the United States Court of Appeals for the Federal Circuit has held that, "contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." *Impresa*, 238 F.3d at 1332 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). "Accordingly, the test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of [the] exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Id.* at 1332–33 (internal quotations omitted).

The final step is the court's analysis to ascertain whether the federal agency otherwise acted in an arbitrary or capricious manner, with respect to the procurement at issue. *See Banknote*, 365 F.3d at 1350 ("[A] reviewing court shall set aside the agency action if it is 'arbitrary, capricious, [or] an abuse of discretion.'"). The United States Supreme Court has held that a federal agency's decision is "arbitrary and capricious," when an agency "entirely failed to consider an important aspect of the problem, offered an explanation for [the] decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

3.      **General Dynamics Mission Systems, Inc.'s Complaint.**

Count I of the January 9, 2018 Complaint alleges that the TSA failed to evaluate the quoters' technical approaches on a "common basis." Compl. ¶¶ 72–79. Specifically, Count I alleges that GDMS developed a baseline price of $52 million that met the Task 4 Integration requirement. Compl. ¶ 76. Given this baseline price, "Unisys's total evaluated price of $30 million could not have included the requisite TSE integration, testing[,] and certification activities." Compl. ¶ 77. Therefore, "Unisys could not have been found Acceptable[,] unless [the] TSA improperly waived the requirements of the Solicitation[.]" Compl. ¶ 77.

Count II of the January 9, 2018 Complaint alleges that the TSA failed to evaluate the quoters' pricing information on a "common basis." Compl. ¶¶ 80–86. Specifically, Count II alleges that GDMS "provided a total unit price for each BPA CLIN found in Attachment 6" of the RFQ that "was nearly six times higher than Unisys's." Compl. ¶ 82 (emphasis omitted). In light of this "significant price differential, GDMS and Unisys could not have completed the Attachment 6 pricing spreadsheet on a common basis." Compl. ¶ 83.

Count III of the January 9, 2018 Complaint alleges that the TSA failed to conduct discussions with fundamental fairness. Compl. ¶¶ 87–91. FAR Part 8 procurements do not require federal agencies to conduct discussions with quoters, but, "if the agency chooses to engage in discussions, those discussions must be fundamentally fair." Compl. ¶ 90 (citing 48 C.F.R. § 1.102-2(c)(3)). In this case, the TSA conducted discussions, "because GDMS was given an opportunity to revise [the] proposal." Compl. ¶ 90. But, this discussion was "fundamentally unfair," because the TSA "entirely failed to inform GDMS that [GDMS's] price was substantially higher than [the] winning price—so high that no technical superiority could overcome the price differential[.]" Compl. ¶ 91.

Count IV of the January 9, 2018 Complaint alleges that the TSA failed to recognize the "high risk" associated with Unisys's proposal. Compl. ¶¶ 92–95. Specifically, "Unisys's Stealth solution poses multiple risks that [the TSA] failed to recognize or assess in assigning it an Acceptable rating . . . under the Technical Approach Factor." Compl. ¶ 95. "A more thorough review of Unisys's quote, as required by the RFQ, would have revealed that Unisys's propos[al] did not meet the RFQ's requirements and greatly increased performance and cost risk to the [TSA]." Compl. ¶ 95.

Count V of the January 9, 2018 Complaint alleges that the TSA conducted an unreasonable evaluation of GDMS's staffing approach. Compl. ¶¶ 96–99. The TSA assigned GDMS's staffing approach a "Weakness," because GDMS "did not explain why 16 months of Program Manager work [was] needed to cover 12 months of work for Order #1." Compl. ¶ 97 (quoting Compl. Ex. 9). Consequently, although "the number of hours GDMS bid for the Program Manager BPA labor category totaled more than 12 months, [the TSA] failed to recognize that the number of hours that were actually proposed for the Program Management task was far lower." Compl. ¶ 98.

### 4.    General Dynamics Mission Systems, Inc.'s Motion For Judgment On The Administrative Record.

GDMS argues that Unisys's proposal did not meet the Task 4 Integration requirement, requiring that the contractor must "engage directly with OEMs to develop/modify the TSE's system software to implement the STIP connectivity of their respective TSE to STIP." Pl. Mot. at 14 (quoting Tab 7, AR 297).  Of course, Unisys advised the TSA that it can "integrate the TSE ███████████ the OEM support" and the proposal ██████████████ ████████████." Pl. Mot. at 14–15 (citing Tab 32, AR 3234).  But, Unisys ████████████████████████████████████████" Pl. Mot. at 15.

Unisys's proposal violated the TSA's Information Assurance Policy, that required that "[t]he [c]ontractor shall comply with all [Department of Homeland Security] and [the] TSA security controls *to ensure that the Government's security requirements are met*." Pl. Mot. at 15–16 (quoting Tab 7, AR 323 (emphasis added)).  In short, the "TSA's [Information Assurance P]olicy prohibits users from allowing others to use their accounts[.]" Pl. Mot. at 16.  But, the TSA recognized that Unisys's proposal was inconsistent with the TSA's Information Assurance Policy.  Pl. Mot. at 16 (citing Tab 34, AR 3583 ██████████████████████ is . . . not aligned with the TSA's Information Assurance [P]olicy[,] ██████████████████████████████████.")).

In addition, the TET's evaluation recognized that, "Unisys's proposal ████████████ ████ failure . . . , which, according to the TET, would be 'devastating.'" Pl. Mot. at 17 (quoting Tab 34, AR 3579).  The TET concluded that "the likelihood of the ████████ infrastructure failing is . . . real and probable" and "failure is likely to occur at some point during contract performance."  Pl. Mot. at 18 (quoting Tab 34, AR 3578).  In addition, the TET warned that "the impact of a ████████ failure would be devastating, throwing hundreds of TSE offline and delaying the screening operations for the checkpoints whose TSE would be affected." Pl. Mot. at 18 (quoting Tab 34, AR 3578).  The TET also recognized that Unisys's proposal required physical space at each airport ████████, but the "TSA cannot make assurances to airport space availability and/or environmental controls[,] since [the] TSA does not own airport space." Pl. Mot. at 19 (quoting Tab 22, AR 2289).  Despite these significant technical concerns, the TET nevertheless assigned Unisys's proposal only a "Moderate" risk rating.  Pl. Mot. at 18–19.

The TET also overlooked the import of the fact that Unisys's proposal would require the TSA "to rewrite all the programs that access the STIP database," because it "eliminat[ed] the Oracle-based STIP database in favor of a 'big data' STIP database." Pl. Mot. at 20 (citing Tab 32, AR 3226).  As a result, "[a]n error in rewriting the programs that access the STIP database could make the TSE data inaccessible, thus making security threat trends unidentifiable." Pl. Mot. at 20.  In addition, Unisys would need to work with OEMs to upgrade the TSE operating systems, because not all TSE models currently support Windows or Linux.  Pl. Mot. at 20 (citing Tab 7, AR 371).  Unisys, however, explained to the TET that Unisys can "integrate the TSE ████████ the OEM support." Pl. Mot. at 20–21 (quoting Tab 32, AR 3234).

The PET also raised several concerns with Unisys's pricing assumptions during the "communications process," but, in each instance, "instead of making the necessary technical revisions and upward adjustments to [the] pricing to account for [the] . . . assumptions, Unisys's response was to simply remove the assumption from [the] proposal without any corresponding change to [the] proposed technical approach."  Pl. Mot. at 28–31 (citing Tab 35, AR 3600–01).

> **5.    The Government's Response And Cross-Motion For Judgment On The Administrative Record.**

The Government responds that the QSA did not abuse his discretion in awarding the BPA for DOMAIN support services to Unisys, because the TET "rationally" determined that Unisys's proposal was "Acceptable" and the PET's recommendations were "rational."    Gov't Resp. at 15–30.

The Administrative Record directly contradicts GDMS's assertion that Unisys's proposal did not allow the TSE to perform the tasks instructed by the STIP client.  Gov't Resp. at 16 (citing Tab 18, AR 1664, 1667, 1670).  To the contrary, Unisys's proposal provided that "██████ █████████ of TSE is built in and integrated with the Operational Dashboard [and other components to] enable a data layer that is ███████████████ and supports ███████████ for adding new functional capabilities without disruption in service."  Gov't Resp. at 20 (quoting Tab 32, AR 3226).   In other words, Unisys's "unique infrastructure would facilitate that functionality." Gov't Resp. at 20–21 (citing Tab 32, AR 3232 ("███████████████████████████ ██████████████████████████████████")).

The Government concedes that Unisys's proposed infrastructure changes and PIV Authentication were rated by the TET as a "Weakness."  Gov't Resp. at 21 (citing Tab 34, AR 3582–83).  The TET expressed concern that Unisys's proposal to provide ██████████ capability would be "problematic for operational use and not allow [TSOs] access to certain functions through the STIP client."  Gov't Resp. at 21–22 (citing Tab 34, AR 3583).  The TET also found that Unisys's "implementation presented practical problems that would make it difficult for [TSOs] to comply with [the] TSA [Information Technology Security Policy Handbook]." Gov't Resp. at 22 (citing Tab 34, AR 3582–83).  Nevertheless, the TET decided to rate Unisys's proposal "Acceptable," despite the assignment of one or more "Weaknesses" or "Deficiencies." Gov't Resp. at 22–23 (citing Tab 16, AR 1166–67).

The Government also contends that the PET's recommendation was "rational," because the PET compared both endpoint security solutions on an equal basis and included all prices in the evaluation.  Gov't Resp. at 27–30.  The fact that Unisys also withdrew four of the assumptions in the price proposal created no risk to the TSA, because "[i]n each instance, the assumption related to a firm-fixed-price CLIN[.]"  Gov't Resp. at 30.

> **6.    Unisys Corporation's Response And Cross-Motion For Judgment On The Administrative Record.**

Unisys adds that the proposal met the Task 4 Integration requirement, because it "provide[d] a detailed discussion of [the] planned interactions with OEMs to assure that the TSE [would] be able to communicate with the STIP [c]lient."  Int. Mot. at 20–21 (citing Tab 32,

AR 3232–35). Unisys's proposal also did not violate the TSA's Information Assurance Policy, because it did "not depend in any way on having a centralized login capability, nor [did] it depend on any kind of proxy login where credentials are not entered as part of the login process." Int. Mot. at 21–22. Nor did Unisys's proposal pose a "High" risk to the TSA. Int. Mot. at 22–26. Specifically, the ▮▮▮▮▮▮▮ failure identified by the TET presented a minimal risk to the TSA, because "a failure only impacts the data flow from the TSE to the network, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," "no data would be lost," "any down time would be momentary," and "there would be few, if any, failures because the solution was designed to achieve 99.9% or greater availability." Int. Mot. at 23–24 (citing Tab 32, AR 3246). Nor did Unisys's proposal require airport access outside of the TSA's space, because the plan was "to have the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Int. Mot. at 24 (quoting Tab 32, AR 3245 (internal quotations omitted)).

The Administrative Record does not support GDMS's argument that use of a STIP database other than the Oracle-based STIP database presents a risk to the TSA, nor does it support GDMS's argument that Unisys's operating system is incompatible with the TSE's operating system. Int. Mot. at 25–26. Likewise, the process for the operating system patching and hardening does not pose a "High" risk to the TSA, because it is "carried out[,] pursuant to [the] TSA directives and in close coordination with [the] TSA." Int. Mot. at 26 (citing Tab 32, AR 3238–39).

Finally, the Administrative Record reflects that Unisys's and GDMS's quotes were evaluated on an equal basis. Int. Mot. at 28–33. FAR Part 8 requires that "[t]he ordering activity is responsible for considering the level of effort and the mix of labor proposed to perform a specific task being ordered, and for determining that the total price is reasonable." Int. Mot. at 31 (quoting 48 C.F.R. § 8.405-2(d)). In this case, the RFQ provided that "[t]he [PET would] evaluate total evaluated price." Int. Mot. at 31 (quoting Tab 14, AR 985). The PET decided that Unisys's price was "fair and reasonable." Int. Mot. at 31 (quoting Tab 35, AR 3617). "What GDMS really seeks is a price-realism analysis, which it knows is foreclosed by the plain language of the [RFQ]." Int. Mot. at 28, 32 (citing Tab 14, AR 985). Therefore, it would be improper for the court to consider whether the PET unreasonably evaluated Unisys's price. Int. Mot. at 32–33 (citing Tab 14, AR 985).

### 7.      General Dynamics Mission Systems, Inc.'s Reply In Support Of The Motion For Judgment On The Administrative Record And Opposition To The Government's And Unisys Corporation's Cross-Motions For Judgment On The Administrative Record.

GDMS replies that the "Government and Unisys have both failed to provide any logical explanation for how a technical solution that was likely to fail, resulting in 'devastating' consequences, with significant adverse impacts could have warranted anything less than a 'High'

risk rating under [the] TSA's Quot[ation] Evaluation Plan[.]"  Pl. Reply at 11–12 (citing Tab 16, AR 1166).  This is further evidenced by the TET's conclusion that the risk from Unisys's proposal, requiring a change to the network architecture by ███████████, was only "Moderate," instead of a "High" risk.  Pl. Reply at 13.[14]

Contrary to the Government's argument, Unisys's technical approach "rendered it technically [U]nacceptable" and rendered Unisys ineligible for award.  Pl. Reply at 15.  In addition, the Government's argument that "Unisys complied with the RFQ's PIV authentication requirement" is not supported by the Administrative Record, because the TET found that Unisys's proposal did not conform to the TSA's Information Assurance Policy.  Pl. Reply at 15 (citing Tab 34, AR 3538 ("The ███████████████ to these ████████████████ is also not aligned with [the] TSA's Information Assurance Policy ██████████████.")).  Therefore, the TET should have rated Unisys's technical approach "Unacceptable," because it "inevitably exposes the Government to the highest level of risk."  Pl. Reply at 19 (citing Tab 16, AR 1167 (defining an "Unacceptable" technical approach as one that "fails to meet one or more [the] TSA requirements" and provides a "Risk to the [TSA]" that is "High.")).

Unisys's proposal also failed to meet the Task 4 Integration requirement, because Unisys's proposal to ensure that the STIP client could communicate with the TSE did not obviate the need to work with the OEMs to update the TSE.  Pl. Reply at 21–22 (citing Tab 7, AR 297 ("The Contractor shall engage directly with OEMs to develop/modify the TSE's system software to implement the STIP connectivity . . . in accordance with the requirements defined in the STIP [interface requirements document].")).  Nor did Unisys's proposal explain "how it will work with OEMs to update the functionality of the TSEs."  Pl. Reply at 23.  Unisys's proposal to add functional capabilities to an "Operational Dashboard" provided the TSA users with access to additional functional capabilities, but it did not provide the TSE with any additional capabilities to perform requests.  Pl. Reply at 23–24 (citing Tab 32, AR 3227).  In that vein, Unisys's proposal "to change the STIP database from Oracle to a 'big data' STIP database created even more risk, because this changes the way data is stored, and such a change "necessarily requires a change in the way data is accessed."  Pl. Reply at 24–25.  And, changes to the STIP database create risk, because "applications that access the database [must] use a different programming language" in addition to "revisions to the interfaces for the applications that access the STIP database."  Pl. Reply at 25.

In sum, the TET failed to compare quoters on an equal basis.  Pl. Reply at 26–29 (citing *Naplesyacht.com, Inc. v. United States*, 60 Fed. Cl. 459, 472 (Fed. Cl. 2004) (determining, under circumstances where the Government "decided to abandon and/or waive the technical

---

[14]  GDMS contends that this erroneous decision was exacerbated by the fact that the TSA was not able to guarantee space ████████ that it does not own, "even if airports agree to restructure their facilities' architectures ████████████████████, they will need to be compensated by [the] TSA . . . [a]nd, if ███████████████████████, the airports need to be compensated for upgrading the network connections."  Pl. Reply at 13.  And, "communicating and contracting with airports ██████████████████████ creates a schedule risk[.]"  Pl. Reply at 13.

requirements set forth in the [s]olicitation," it was "obligated at least to advise all [quoters] of that decision" and "provide a coherent and reasonable explanation of why [the] decision was rational." (internal quotations omitted)).

8.    **The Government's Reply In Support Of The Cross-Motion For Judgment On The Administrative Record.**

The Government concedes that the TET reasonably assigned a "Weakness" to Unisys's architecture proposal, because Unisys addressed both ████████████████ by explaining that "a failed ██████████ to achieve 99.9% availability or greater." Gov't Reply at 4, 5 (citing Tab 34, AR 3579). The TET also reasonably assigned a "Weakness" to Unisys's proposed architectural change, because "whatever cost might be associated with ██████████████████ was included in the firm-fixed-price CLIN, so there was no cost risk to the [TSA]." Gov't Reply at 5. The TET also properly recognized that "██████████████████████" were necessary under Unisys's proposal. Gov't Reply at 5, 6 (citing Tab 34, AR 3576, 3581). The TET also considered Unisys's proposal's compliance with the TSA's Information Assurance Policy and determined that Unisys's ██████████ capability presented a "Weakness." Gov't Reply at 7 (citing Tab 34, AR 3583).

The TET also determined that Unisys's proposal met the Task 4 Integration requirement, because it "explains that Unisys intends to enter into agreements with the OEMs and provide the type of functionality required in the RFQ." Gov't Reply at 8 (citing Tab 32, AR 3232–34). And, the TET "reasonably" found no risk in Unisys's proposed database upgrade, because, although the "software to connect the database to the existing programs may need to be changed," this software will be tested before Unisys's proposal is implemented. Gov't Reply at 9.

The bottom line is the TET compared quoters on an equal basis and concluded that Unisys's proposal satisfied the RFQ's required integration work and associated costs. Gov't Reply at 10 (citing Tab 32, AR 3301 (Unisys's "proposal include[d] the necessary agreements/understanding between Unisys and each of the OEM vendors to integrate their respective proprietary technologies into the STIP connectivity solution[ and] . . . include[d] all OEM support work required to meet the requirements in the SOW.")).

9.    **Unisys Corporation's Reply In Support Of The Cross-Motion For Judgment On The Administrative Record.**

Unisys notes that GDMS's reliance on *Naplesyacht* is misplaced, because there the court determined that the agency did not abuse its discretion in analyzing price and no other issues required the subjective judgment of the agency. Int. Reply at 15 (citing *Naplesyacht*, 60 Fed. Cl. at 462, 470–74).

10.     **The Court's Resolution.**

a.      **The Transportation Security Administration Did Not Violate FAR 8.405-3(b)(2).**

i.      **The Technical Evaluation Team Fairly Considered Quotations Submitted In Response To The Request For Quotations.**

Count I of the January 9, 2018 Complaint alleges that the TET failed to evaluate the technical proposals from GDMS and Unisys on a "common basis." Compl. ¶¶ 72–79.  Neither the FAR nor the RFQ, however, requires the TSA to evaluate proposals on a "common basis."  But, FAR 8.405-3(b)(2) requires that the procuring agency "ensure all quotes received are fairly considered and award is made in accordance with the basis for selection in the RFQ."   48 C.F.R. § 8.405-3(b)(2)(vi).  Therefore, the court reads Count I of the January 9, 2018 Complaint as challenging the TET's technical evaluation under FAR 8.405-3(b)(2).

Specifically, Count I of the January 9, 2018 Complaint alleges that Unisys's technical proposal could not have met the Task 4 Integration requirement of the RFQ, based on the total evaluated price of Unisys's price proposal.  Compl. ¶ 77.  Under the Task 4 Integration requirement, a quoter was required to demonstrate that it would "engage directly with OEMs to develop/modify the TSE's system software to implement the STIP connectivity of their respective TSE to STIP via TSANet" and "collaborate with TSE OEMs as they develop STIP functionality in accordance with the proposed integration approach put forward by the contractor." Tab 7, AR 297–98.  Therefore, GDMS developed a baseline cost to meet the minimum Task 4 Integration requirement, but the total was $52 million. Compl. ¶ 76.  Since the total evaluated price of Unisys's proposal was only $30 million, the January 9, 2018 Complaint alleges that Unisys's proposal could not have met the technical requirements to accomplish Task 4 Integration.  Compl. ¶ 77.

As a threshold matter, the RFQ did not require quoters to consider cost in meeting the Task 4 Integration requirement.  Tab 7, AR 297–98.  Therefore, the baseline cost methodology that GDMS used is not determinative of whether another proposal satisfied the Task 4 Integration requirement.  Tab 31, AR 2461.  In fact, the RFQ evidences that the technical acceptability for the Task 4 Integration requirement had no relationship to the total evaluated price, because each of the CLINs would be set at a firm-fixed-price.  Tab 14, AR 990.  What is relevant, however, is the fact that the RFQ encouraged quoters to propose "*alternative cybersecurity solution[s]* for the endpoint TSE." Tab 12, AR 458 (emphasis added); Tab 7, AR 279 ("[S]ervices may . . . be required to develop new systems, consolidate and/or integrate systems, develop interfaces with other systems/services, and expand the existing systems to also support other program areas[.]").  GDMS, as it must, concedes that Unisys's proposal met the RFQ's requirement for an endpoint security solution.  Pl. Reply at 7 n.3; Tab 32, AR 3103–3316.  And, the reason that Unisys's proposal cites a lower cost for the Task 4 Integration requirement was because it eliminated the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, so that Unisys's engagement with the OEMs was significantly less expensive than GDMS's proposal.  Tab 32, AR 3232 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮"); Tab 32, AR 3308 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

_____.").  Therefore, the allegations in Count I of the January 9, 2018 Complaint challenging Unisys's total evaluated price do not evidence that the TET failed to fairly consider the technical approaches submitted by both GDMS and Unisys.

For these reasons, the court has determined that the TET's technical evaluation did not violate FAR 8.405-3(b)(2)(vi).

> ### ii.    The Price Evaluation Team Fairly Considered Quotations Submitted In Response To The Request For Quotations.

In Count II of the January 9, 2018 Complaint, GDMS alleges that Unisys's lower total evaluated price evidences that the PET did not fairly consider the price proposals from GDMS and Unisys on a "common basis."[15]  Compl. ¶¶ 80–86 ("GDMS's total evaluated price was ***nearly six times higher*** than Unisys's.  Given this significant price differential, GDMS and Unisys could not have completed the Attachment 6 pricing spreadsheet on a common basis.") (bold and emphasis in original).  This allegation, however, fails to reflect that quoters' price proposals could be different, since the TSA invited alternative technical solutions.  Tab 12, AR 458 (explaining that the TSA is seeking "*alternative cybersecurity solution[s]* for the endpoint TSE[.]" (emphasis added)).

Nevertheless, GDMS argues that the PET did not fairly consider the quoters' price proposals, because "Unisys's [price proposal] failed to include the necessary *costs*[,]" as it removed four assumptions from the initial quote, without adjusting the total evaluated price.  Pl. Mot. at 28 (citing Tab 18, AR 1756).  Here, GDMS appears to argue that the PET was required to conduct a price realism analysis, *i.e.*, to "consider[] whether an offeror's price is too low, such that it indicates a risk of poor performance and a lack of understanding of the solicitation requirements."  *See UnitedHealth*, 132 Fed. Cl. at 554.  But, the RFQ stated that the TET "[would] not evaluate [q]uotes for price realism."  Tab 14, AR 1078.

Congress requires that a procuring agency evaluate proposals, based on either cost or price.  *See* 41 U.S.C. § 3306(c)(1)(B) ("In prescribing the evaluation factors to be included in each solicitation for competitive proposals, an executive agency shall . . . include cost or price to the Federal Government as an evaluation factor that must be considered in the evaluation of proposals.").  Likewise, the United States Court of Appeals for the Federal Circuit has held that "[p]rice (or cost) must always be a 'factor' in an agency's decision to award a contract[.]"  *See Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 959 (Fed. Cir. 1993).

In this case, the TSA issued the RFQ under FAR Part 8.  Tab 6, AR 179.  FAR Part 8 states that "[t]he ordering activity is responsible for . . . determining that *the total price* is reasonable."  48 C.F.R. § 8.405-2(d) (emphasis added).  In this procurement, the RFQ required the PET to

_____

[15] As previously discussed, the appropriate inquiry should be whether both price proposals were "fairly considered."  48 C.F.R. § 8.405-3(b)(2)(vi).

evaluate quotations by *total evaluated price*." Tab 14, AR 1078 (emphasis added). The Administrative Record evidences that the PET did just that. Tab 35, AR 3617 ("each [q]uoter's . . . total evaluated price [was] determined to be fair and reasonable"). And, the Revised Price Evaluation concluded that "each [q]uoter's labor rates for all years and the total evaluated price is determined to be fair and reasonable." Tab 35, AR 3617. Therefore, the court has determined that the PET fairly considered the total evaluated price of the proposals of GDMS and Unisys, pursuant to the RFQ and FAR Part 8.

For these reasons, the court has determined that the PET's price evaluation did not violate FAR 8.405-3(b)(2)(vi).

### iii.    The Quotation Selection Authority Complied With The Request For Quotations In Awarding The Blanket Purchase Agreement.

Count I of the January 9, 2018 Complaint alleges that the QSA did not comply with the RFQ in awarding the BPA to Unisys, because Unisys's proposal did not meet the Task 4 Integration requirement of the RFQ. Compl. ¶¶ 75–77. In addition, GDMS argues that the QSA did not comply with the RFQ, because Unisys's proposal violated the TSA's Information Assurance Policy. Pl. Mot. at 15–16.

The Administrative Record evidences that Unisys's proposal addressed, but did not specifically comply with the Task 4 Integration requirement and each of the related technical prompts. This is so, because Unisys's proposal was qualified, *i.e.*, Unisys promised only that *it will* engage directly with the OEMs to develop or modify the TSE's system software and develop STIP functionality. Tab 32, AR 3232–33 ("Unisys *will work* with each of the TSE vendors to understand their [application programming interfaces] as they affect STIP [c]lient functionality" and ███████████████[.] When Government testing is completed at the [TSA Systems Integration Facility], Unisys will work with the TSE vendors to remediate defects found by the testing at the [TSA Systems Integration Facility]." (emphasis added)). In addition, in response to the technical prompts, Unisys only promised to collaborate with the OEMs on technical issues in the future. Tab 32, AR 3234 ("A key for successful achievement of program objectives is a close working relationship between multiple OEM vendors and partners to plan and deploy technology and deployment solutions. *We* have existing relationships and *will collaborate* with all members of the TSA STIP ecosystem to facilitate transparency and a team-oriented approach to enable success of the DOMAIN Program's mission." (emphasis added)); Tab 32, AR 3235–36 ("For DOMAIN, we have established relationships with the TSE OEM vendors and initiated technical and contractual discussions. Upon award, *formal agreements will be executed* to define roles and responsibilities and negotiate the items required for development, testing, and deployment of new TSE integration tasks. *We will leverage* our vendor management processes to accelerate integration and deployments." (emphasis added)). For this reason, the Revised Technical Evaluation did not explicitly state that Unisys's proposal satisfied the Task 4 Integration requirement. Tab 34, AR 3573–90. Nevertheless, the TET decided that Unisys's proposal, in effect, satisfied the Task 4 Integration requirement by the technical discussion of Unisys's "proposed ███████████████," so that Unisys's proposal was deemed "Acceptable" for Factor 2, Technical Approach. Tab 34, AR 3576, 3580, 3582.

The Quotation Evaluation Plan, however, required the TET to "*evaluate* the [q]uoter's response to each of the Technical Prompts . . . in the RFQ and . . . *assess* the extent to which the [q]uoter's technical approach demonstrates a thorough understanding of the complexity and magnitude of the requirements and an ability to successfully perform under the resultant BPA." Tab 16, AR 1160 (emphasis added).   Instead, Unisys only promised to satisfy the technical requirements, instead of "demonstrating a thorough understanding of the complexity and magnitude of [those] requirements."   Tab 16, AR 1160.   Nevertheless, the TET appears to have found Unisys's response satisfactory.   Relying on that determination, the QSA stated that he "independently reviewed the results of the evaluations, all applicable documents, and the Trade-Off Recommendation developed by the TET Chair, PET Chair, and QSC" and determined that Unisys's proposal was "Acceptable" for Factor 2, Technical Approach.   Tab 36, AR 3620.   But, the court stated at the oral argument, it appeared that the QSA simply "rubber-stamped" the findings of the TET.   2/23/18 TR at 40–41.

In a similar vein, GDMS argues that Unisys's proposed "███████████" capability violated the TSA's Information Assurance Policy, because "████████████████████ ███████████████████████."   2/23/18 TR at 26 (citing Tab 32, AR 3240); Pl. Mot. at 15–16.   The TET, however, "determined that this ███████████ should not be used."   2/23/18 TR at 26 (citing Tab 34, AR 3581).   In effect, GDMS asserts this was "a waiver of [one of the RFQ's] requirement[s];" therefore, the TET should have found Unisys's proposal technically unacceptable.   2/23/18 TR at 26–27.   GDMS, however, misreads the Quotation Evaluation Plan, that allows a quote to include "a material failure . . . to meet a requirement" of the RFQ, but still be rated "Acceptable" for Factor 2, Technical Approach.   Tab 16, AR 1167 ("The [q]uoter's approach to Factor 2 [is "Acceptable," if it] generally meets the TSA's requirements.   There may be Strengths, but offset by Weaknesses or Deficiencies."); Tab 16, AR 1166 (defining "Deficiency" as "[a] material failure of the quote to meet a requirement[.]").

Ordinarily, a proposal must comply with the material terms and conditions of the solicitation to be acceptable and eligible for award.   *See Allied Tech. Grp., Inc.*, 649 F.3d at 1329 ("[A] proposal that fails to conform to the material terms and conditions of the solicitation[16] should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." (internal quotation marks and citations omitted)).   The RFQ at issue in *Allied Technology Group* required each proposal to include "a complete and acceptable quote in accordance with the instructions contained herein.   Such a quote . . . *accepts each of [the] requirements*, provisions, terms and conditions, and clauses stated in all sections of this RFQ."   *Id.* (emphasis added).   In other words, all proposals were required to "highlight any provisions that conflict with the Terms and Conditions outlined in the . . . substantive terms of the contract" and were advised that "[c]onflicting provisions [would]

---

[16] A solicitation term is material if failure to comply with it would have a non-negligible effect on the price, quantity, quality, or delivery of the supply or service being procured.   *See Centech*, 554 F.3d at 1038 (discussing the materiality requirements listed in FAR 14.405, Minor Informalities or Irregularities in Bids).   Based on the court's review of governing precedent, materiality does not depend on the evaluation procedures used by a procuring agency.   *See id.*; *see also E.W. Bliss*, 77 F.3d at 448 ("In negotiated procurements, a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable[.]").

be considered as exceptions to the Terms and Conditions of the RFQ" and could "adversely impact" an evaluation rating.  *Id.* at 1322.  Therefore, to comply with the material terms and conditions of the RFQ, proposals were required to accept each of the RFQ's requirements, provisions, terms and conditions, and clauses, or certify compliance with such terms.  *Id.* at 1329.

In this case, the RFQ provided that an award would be made to the "responsible [q]uoter *whose offer conforming to the solicitation* will be most advantageous to the Government, price and other factors considered."  Tab 14, AR 1075 (emphasis added).  Therefore, unlike the RFQ in *Allied Technology Group*, the DOMAIN RFQ did not require strict compliance with every term and condition, provision, and requirement therein, nor did it require quoters to highlight or otherwise identify any exceptions.[17]  This is evidenced by the Quotation Evaluation Plan, that allowed the TET to rate a proposal "Acceptable" for Factor 2, Technical Approach, even if it failed to meet a requirement of the RFQ.  Tab 16, AR 1166–67.[18]  But, if Unisys's proposal failed to comply with the Information Assurance Policy, that failure would have a "non-negligible effect on the price" of Unisys's proposal, because the orders to be placed under the BPA were to be made on a firm-fixed-price basis.  Tab 14, AR 988.  Therefore, compliance with the Information Assurance Policy does not appear to be a material term or condition of the RFQ, so that failure to comply with it would render Unisys's proposal unacceptable.  The bottom line is, even if Unisys's proposal failed to meet the Task 4 Integration requirement, the RFQ allowed the TET discretion to rate Unisys's proposal "Acceptable" for Factor 2, Technical Approach.[19]

For these reasons, the court has determined that the QSA did not violate FAR 8.405-3(b)(2)(vi).

---

[17]  At oral argument, Unisys's counsel explained that, although the TET had some concern about Unisys's technical solution, it was satisfied that Unisys complied with the Information Assurance Policy.  2/23/18 TR at 90 ("[T]he evaluators looked at this, and although they seemed to feel that that was a concern, they said, okay, that's a concern, [M]oderate risk.").

[18]  The Quotation Evaluation Plan clarified that an "Acceptable" rating for Factor 2 meant that "[t]he [q]uoter's approach for Factor 2 generally meets the TSA's requirements.  There may be Strengths, but offset by Weaknesses or Deficiencies."  Tab 16, AR 1167.

[19]  The Revised Technical Report did not reflect that Unisys's proposal failed to meet the Task 4 Integration requirement.  Instead, it stated that, "[t]he TET believe[d] that ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ should not be used" and "[t]he ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is also not aligned with [the] TSA's Information Assurance [P]olicy[.]"  Tab 34, AR 3583.  As a result, the TET assigned Unisys's proposal a "Weakness," instead of a "Deficiency."  Tab 34, AR 3583.  But, even if the TET had assigned Unisys's proposal a "Deficiency," the TET still could have rated Unisys's proposal "Acceptable" for Factor 2, Technical Approach, because "Acceptable" proposals may contain "Weaknesses" or "Deficiencies."  Tab 16, AR 1167.  Therefore, it was reasonable for the TET to rate Unisys's proposal "Acceptable," where it contained two "Strengths," two "Weaknesses," and one "Deficiency."  Tab 34, AR 3576.

> **b.    The Administrative Record Does Not Evidence That The Technical Evaluation Team's "Moderate" Risk Rating Of Unisys Corporation's Proposal Was Arbitrary And Capricious.**

Count IV of the January 9, 2018 Complaint alleges that the TET's "Moderate" risk rating of Unisys's proposal was arbitrary and capricious, because it: (1) "████████████████ [technical] failure;" and (2) require[d] physical space at airports that TSA does not own or control. Pl. Mot. at 17–19.  The Quotation Evaluation Plan, however, provided that that the TET could assign risk ratings, based on "the expected likelihood that there will be an adverse impact to management, performance, cost[,] or schedule after contract award."  Tab 16, AR 1166.

The Administrative Record evidences that the TET indeed considered the ████████ technical failure and physical space requirements of Unisys's proposal and recognized that Unisys's proposal "may introduce a tremendous amount of risk to the [TSA]," because "the likelihood of the . . . infrastructure failing is real and probable" and "[t]he impact of a failure would be devastating[,] . . . hav[ing] a significant and serious negative impact on TSA mission capabilities without the presence of redundant architecture or a recovery plan to mitigate the impact."  Tab 23, AR 2342.  Therefore, the Initial Technical Evaluation rated this part of Unisys's proposal as a "Weakness."  Tab 23, AR 2342.  Although Unisys submitted a revised quote, the Revised Technical Evaluation continued to find that Unisys's "proposed architecture ████████ ████████ technical failure, and that the impact of a ████████ failure would be devastating[.]" Tab 34, AR 3579 (emphasis omitted).  As such, the TET found that this "Weakness" was not resolved.  Tab 34, AR 3579.  Nevertheless, the TET took account of that latitude afforded by the RFQ and concluded that Unisys's proposal presented only a "Moderate" risk to the TSA.  Tab 34, AR 3576 ("The TET maintained the rating of 'Acceptable' for Factor 2, Technical Approach" and that "[r]isk to the [TSA] remains Moderate." (emphasis omitted)).

GDMS also challenges the physical space requirements of Unisys's proposal.  Pl. Mot. at 19.  The Revised Technical Evaluation stated that the "TSA would need to confirm that all airports could support [Unisys's] solution," because "[e]ven at larger airports, TSA does not own, allocate, or control the IT closet and rack spaces that would need to be made available[.]"  Tab 34, AR 3581.  But, the Revised Technical Evaluation also recognized that Unisys's revised proposal "added . . . the Microbridge, which wasn't previously mentioned, and the Stealth ████████ ████████, which may increase operational and maintenance complexity of keeping these different pieces of equipment operational[.] . . . [Although this increased the risk to the TSA, the] revised response potentially increases the [q]uoter's ability to successfully deliver their solution to difficult to access locations in an airport."  Tab 34, AR 3581–82.

In sum, GDMS urges the court to "apply[] the logical conclusion to the . . . Government's own findings," and determine that the TET unreasonably "assigned [M]oderate risk for this rather than [H]igh risk[.]"  2/23/18 TR at 12.  There is no question that the TET recognized that Unisys's proposal could have an adverse impact on the TSA's operations.  Tab 34, AR 3578–79 ("[T]he likelihood of the . . . infrastructure failing is real and probable" and "[t]he impact of a failure would be devastating.").  The TET, however, was satisfied that Unisys's proposal presented only a "Moderate" risk that was acceptable to the TSA.  Tab 16, AR 1166.  GDMS adds that the TET also "overlooked" the fact that Unisys's proposal would require the TSA "to rewrite all the

programs that access the STIP database." Pl. Mot. at 20. But, the Administrative Record evidences that the TET also considered this problem and determined that, overall, the risk was "Acceptable" under Factor 2's Technical Approach. Tab 34, AR 3576, 3580, 3582.

The United States Court of Appeals for the Federal Circuit has held that the court "may not substitute its judgment for that of the agency," where the federal agency's determination is "reasonable." *See R & W Flammann GmbH,* 339 F.3d at 1322 ("when an officer's decision is reasonable[,] a court may not substitute its judgment for that of the agency"). In addition, where a technical evaluation is at issue, the court must defer to the agency's decision. *See E.W. Bliss,* 77 F.3d at 449 ("[T]echnical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess."). In this case, the assumption of the clear risks present and inherent in Unisys's proposal entailed a discretionary determination that was based on the TSA's technical expertise and judgment.

For these reasons, the court has determined that the TET's decision that Unisys's proposal presented only a "Moderate" risk to the TSA was not arbitrary and capricious.

## IV.   CONCLUSION.

For these reasons, GDMS's January 26, 2018 Motion For Judgment On The Administrative Record is denied.[20] The Government's February 2, 2018 Motion For Judgment On The Administrative Record and Unisys's February 2, 2018 Motion For Judgment On The Administrative Record are granted. All other pending motions are denied, as moot.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Chief Judge**

---

[20] Count III of the January 9, 2018 Complaint alleges that the TSA failed to conduct discussions with fundamental fairness, because it did not inform "GDMS that its price was substantially higher than [the] winning price" and "no technical superiority could overcome the price differential[.]" Compl. ¶¶ 87–91 (citing 48 C.F.R. § 1.102–2(c)(3)). GDMS did not pursue this argument further in GDMS's January 26, 2018 Motion For Judgment On The Administrative Record. Therefore, the court has determined that GDMS did not demonstrate that the TSA's actions violated FAR 1.102-2(c).

Similarly, Count V of the January 9, 2018 Complaint alleges that the TSA conducted an unreasonable evaluation of GDMS's staffing approach. Compl. ¶¶ 96–99. GDMS did not pursue this argument in GDMS's January 26, 2018 Motion For Judgment On The Administrative Record. Therefore, the court has determined that GDMS did not demonstrate that the TET's evaluation of GDMS's staffing approach was arbitrary and capricious.

# Court Exhibit A

## TABLE OF ABBREVIATIONS

## GENERAL DYNAMICS MISSION SYSTEMS, INC. v. UNITED STATES, No. 18-49

| | |
|---|---|
| BPA | Blanket Purchase Agreement |
| CLIN | Contract Line Item Number |
| DOMAIN | Domain Awareness Integrated Network |
| GAO | Government Accountability Office |
| GSA | General Services Administration |
| IT | Information Technology |
| OS | Operating System |
| PET | Price Evaluation Team |
| PIV | Personal Identity Verification |
| QSA | Quotation Selection Authority |
| QSC | Quotation Selection Committee |
| RFQ or DOMAIN RFQ | Request For Quote HSTS04-17-Q-CT2506 |
| SOW | Statement Of Work |
| STIP | Security Technology Integrated Program |
| TET | Technical Evaluation Team |
| TSA | Transportation Security Administration |
| TSE | Transportation Security Equipment |
| TSO | Transportation Security Officer |
| WTMD | Walk-Through Metal Detector |